STATE OF NORTH CAROLINA v. THOMAS ELLIS POWELL

No. 9121SC969

(Filed 16 February 1993)

1. **Animals, Livestock, or Poultry § 18 (NCI4th)— dog control ordinance — safety ordinance — violation as involuntary manslaughter**

   A Winston-Salem ordinance requiring that dogs left unattended outdoors be restrained and restricted to the owner's property by a tether, rope, chain, fence, or other device was a safety ordinance which could serve as the basis for a conviction of involuntary manslaughter. A thorough reading of the ordinance dictates the conclusion that it was designed to protect both the persons of Winston-Salem and their property and thus is a safety ordinance.

   **Am Jur 2d, Animals § 116.**

   **Construction and application of ordinances relating to unrestrained dogs, cats, or other domesticated animals. 1 ALR4th 994.**

2. **Animals, Livestock, or Poultry § 18 (NCI4th)— dog control ordinance — intentional, willful, wanton violation**

   There was ample evidence in an involuntary manslaughter prosecution that defendant had intentionally, willfully, and

1

wantonly violated a dog control ordinance where the ordinance required that dogs left unattended outdoors be restrained and restricted to the owner's property by a tether, rope, chain, fence, or other device; defendant's two dogs had been picked up by animal control officers on at least three occasions prior to the fatal attack; defendant admitted that the dogs had been out twice on the day of the victim's death; on one prior occasion the dogs escaped by digging out from underneath the fence and defendant simply covered the hole with a cooler; defendant's next door neighbor testified that the dogs were allowed to run loose on a regular basis and that defendant would often just open the door and let the dogs out; and defendant's ex-girlfriend testified that defendant let the dogs run free both day and night.

**Am Jur 2d, Animals § 116.**

**Construction and application of ordinances relating to unrestrained dogs, cats, or other domesticated animals. 1 ALR4th 994.**

3. **Homicide § 67 (NCI4th) — violation of dog control ordinance — dogs running loose — involuntary manslaughter**

The trial court properly submitted the charge of involuntary manslaughter to the jury where the State presented evidence that defendant's dogs attacked and killed the victim while running loose in violation of a safety ordinance; the dogs were trained by defendant to be aggressive and to scare people; defendant had witnessed the dogs growl at people and bolt toward a young child; and defendant had been warned by a neighbor that the dogs were a liability. A reasonable juror could accept this evidence as supporting a conclusion that defendant's dogs caused the victim's death and that defendant should have foreseen that his dogs, if left to run at large in violation of the city ordinance, could cause serious injury to someone. Because the State in this criminal prosecution presented evidence that defendant intentionally violated an ordinance requiring all unattended dogs to be confined or restrained on the owner's property, the State is not required to prove that defendant's dogs had vicious propensities of which defendant had knowledge.

**Am Jur 2d, Animals § 116.**

**Construction and application of ordinances relating to unrestrained dogs, cats, or other domesticated animals. 1 ALR4th 994.**

Judge WYNN dissenting.

Appeal by defendant from judgment entered 21 September 1990 in Forsyth County Superior Court by Judge Melzer A. Morgan, Jr. Heard in the Court of Appeals 13 November 1992.

*Attorney General Lacy H. Thornburg, by Assistant Attorney General Debra C. Graves, for the State.*

*Appellate Defender Malcolm Ray Hunter, by Assistant Appellate Defender Teresa A. McHugh, for defendant-appellant.*

GREENE, Judge.

Defendant appeals from a judgment entered 21 September 1990, which judgment is based on a jury verdict convicting defendant of involuntary manslaughter, N.C.G.S. § 14-18 (1986), a Class H felony with a maximum term of ten years and a presumptive term of three years.

The evidence presented by the State established that at approximately nine o'clock on the evening of 20 October 1989, twenty-year-old Hoke Prevette (Prevette), an avid jogger, left his home at 805 Salisbury Road in Winston-Salem, North Carolina, to run. At approximately eleven o'clock on the same evening, James Fainter and his wife returned to their home at 701 Cascade Avenue and discovered Prevette's body in their front yard. An autopsy revealed that Prevette, who was five feet, one and a half inches tall and weighed ninety-four pounds, died as a result of wounds caused by multiple dog bites. At the time of the attack on Prevette, a Winston-Salem ordinance provided:

(a) No dog shall be left unattended outdoors unless it is restrained and restricted to the owner's property by a tether, rope, chain, fence or other device. Fencing, as required herein, shall be adequate in height, construction and placement to keep resident dogs on the lot, and keep other dogs and children from accessing the lot. One (1) or more secured gates to the lot shall be provided.

Winston-Salem Code § 3-18 (1989).

David Moore (Moore), who lives two houses away from the Fainter residence on Cascade Avenue, testified that at approximately nine-thirty on the evening of 20 October 1989, he saw in his yard two rottweilers owned by defendant. Moore stated that the dogs, Bruno and Woody, approached him and his girlfriend and that one of them growled. Moore stamped his foot and the dogs ran down the street in the direction of the Fainter residence.

Winston-Salem police officer Jason Swaim went to defendant's house after the discovery of Prevette's body to investigate a report that defendant's dogs had been out that evening. When Officer Swaim told defendant that he wanted to discuss the dogs, defendant responded, "Oh my God, what have they done now?" Defendant admitted that his dogs had been out twice that day and that he had picked them up at approximately nine o'clock p.m. at the intersection of Cascade and Dinmont Streets, a location approximately forty feet from where Prevette's body was discovered. Defendant called his dogs, and they jumped in the back seat.

Officer Sandra Shouse conducted a consent search of defendant's home early on 21 October 1989, collecting a dog food bowl, a portion of the seat of defendant's car, and a portion of the wall from inside defendant's home. Officer Shouse had been dispatched on several occasions prior to 20 October 1989 to search for defendant's dogs. In July, 1989, defendant showed Officer Shouse where the dogs had dug out. Upon returning the dogs to the yard, defendant covered the escape hole with a cooler.

Robert Neill of the State Bureau of Investigation Crime Laboratory testified that six hairs removed from Prevette's clothing were canine; however, he could not match the hairs to a particular dog. An SBI forensic serologist found human blood on Woody's collar, on a sample of Woody's hair, on the dog dish, on a portion of the wall from defendant's home, and on defendant's car seat. According to the serologist, the blood could not be typed because of the presence of an inhibiting substance, possibly soap. A forensic odontologist testified that dental impressions taken from Bruno and Woody were compatible with some of the lacerations in the wounds pictured in scale photographs of Prevette.

Several witnesses testified to seeing Bruno and Woody running loose in the neighborhood prior to 20 October 1989. Jerry Parks (Parks), defendant's next-door neighbor, testified that the dogs were loose regularly, and that if the dogs were out in defendant's yard

and someone walked by, the dogs would "challenge" the person. Parks told defendant that his dogs were a liability, and warned defendant of the dogs' propensity for digging out.

Thomas Dooley (Dooley), another of defendant's neighbors, testified that he saw Bruno and Woody out frequently during the summer of 1989. On one occasion, Dooley was outside in his yard with his three-year-old granddaughter when defendant came outside with his dogs. The dogs bolted from defendant and ran toward Dooley's granddaughter. Dooley got between the dogs and the child, but had some difficulty keeping the dogs away from her. Dooley telephoned police on two occasions to report that the dogs were out.

Forsyth County animal control officers picked up defendant's rottweilers on at least three occasions prior to 20 October 1989. In July and August, 1989, defendant left the dogs in the animal shelter for two and four days, respectively, before retrieving them.

Shelby Walker (Walker) testified that she was living with defendant when he purchased the puppies in the summer of 1988, and that she took care of the dogs for four or five months until she broke up with defendant and moved out. Walker testified that during this time, defendant regularly let the dogs run free, both day and night, and abused the dogs by hitting them and kicking them. According to Walker, defendant would push the dogs at people and encourage them to growl. Defendant consulted with an attack school because he wanted the dogs to be aggressive.

Animal psychologist Donna Brown (Brown), who specializes in applied animal behavior, testified regarding an evaluation for aggressive propensities that she performed on Bruno and Woody on 8 November 1989. The tests, which included a "dominant stare test," a "kitten test," a "startle test," and a "jogger test," were videotaped and shown to the jury. When conducting the jogger test, Brown moved a stuffed model through the dogs' field of vision. When the model was still, the dogs did not show predation; however, when the model moved, Bruno lunged at it, tore it, and shook it. Woody also attacked the moving model, but used more holding, clawing, and dragging than tearing. Brown opined based on the tests that the dogs exhibited predatory tendencies, that they treated a stare as a threat and began to growl, and that both dogs were more aggressive when together than when each dog was alone. According to Brown, the dogs were easily intimidated by a threatening gesture or tone of voice, which indicated that the dogs had

probably been abused. Brown concluded that an attack on a person by Bruno and Woody would be consistent with her observations of their behavior.

Defendant presented several witnesses who testified that Bruno and Woody were friendly and playful and responded to defendant's commands to get down or sit. One witness's nine-month-old daughter played with the dogs and grabbed their tails, yet the dogs never growled or acted negatively toward the child. Several witnesses testified that they never saw defendant let the dogs outside of the fenced yard unattended, and that they never saw defendant abuse the dogs.

Animal behavioralist Peter Borthelt (Borthelt) testified that, although he had not evaluated defendant's dogs, the behavior displayed by the dogs in Brown's videotape was ambiguous. He also testified that the preferred method for evaluating animal behavior is to obtain background information regarding prior behavior of the dog, which allows the behavioralist to determine the appropriate tests to perform. Borthelt testified that dominance aggression in a pet dog occurs only in a social relationship such as a family, and that in order to determine whether Bruno or Woody manifested dominance aggression, one would have to study their behavior while with defendant. Borthelt also stated that the components of predatory behavior are the same as the components of play behavior—chasing, running, and grabbing.

Defendant's motions to dismiss made at the close of the State's evidence and at the close of all the evidence were denied. The jury found defendant "guilty of involuntary manslaughter on the basis of culpable negligence by leaving dogs unattended when not restrained and restricted to the owner's property by a fence adequate to keep the resident dogs on the lot." The trial court, after finding the existence of aggravating factors, sentenced defendant to a term of five years. Defendant appeals.

---

The issues presented are (I) whether Winston-Salem Code § 3-18 is an ordinance designed for the protection of human life or limb; if so, (II) whether the State presented substantial evidence that defendant intentionally, willfully, or wantonly violated the ordinance; and, if so, (III) whether the State presented substantial evidence that defendant's violation of the ordinance was the proximate cause of Prevette's death and, in this regard, whether the

State is required to show that defendant's dogs had vicious propensities of which defendant was aware. Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *State v. Smith*, 300 N.C. 71, 78, 265 S.E.2d 164, 169 (1980).

## I

[1] Defendant argues that Section 3-18 is not an ordinance designed for the protection of human life or limb and that, therefore, the violation of the ordinance is not an unlawful act that can serve as a basis for conviction of involuntary manslaughter. We disagree.

The intentional, willful, or wanton violation of any "safety" statute or ordinance, which proximately results in death, can support a conviction of involuntary manslaughter. *State v. Cope*, 204 N.C. 28, 31, 167 S.E. 456, 458 (1933); *State v. Wilkerson*, 295 N.C. 559, 582, 247 S.E.2d 905, 916-17 (1978). Safety statutes or ordinances are those which are designed for the protection of life or limb and "impose a duty on a person for the protection of others." *Hart v. Ivey*, 332 N.C. 299, 303, 420 S.E.2d 174, 177 (1992).

A thorough reading of the ordinance at issue in the instant case dictates our conclusion that it was designed to protect both the persons of Winston-Salem and their property, and thus is a safety ordinance. The ordinance specifically requires that the fencing used to confine dogs must also be adequate to keep "children from accessing the lot" where resident dogs are kept. We can conceive of no purpose, other than the protection of children from physical harm, for such a requirement, and we therefore reject defendant's contention that the ordinance is merely "a nuisance law."

## II

[2] Having determined that Section 3-18 is a safety ordinance, we also conclude that there is ample evidence, when considered in the light most favorable to the State, that defendant intentionally, willfully, and wantonly violated the ordinance. Bruno and Woody had been picked up by animal control officers on at least three occasions prior to the fatal attack. The dogs had been taken by animal control officers to the animal shelter as recently as August, 1989, two months prior to the death of Prevette. Defendant admitted that his dogs had been out twice on the day of Prevette's death. On one occasion in July, 1989, after the dogs escaped by digging out from underneath the fence, defendant simply covered

the escape hole with a cooler after returning the dogs to the fence. Defendant's next-door neighbor testified that the dogs were allowed to run loose "on a regular basis," day and night, and that defendant would often "just open the door and let the dogs out." Defendant's ex-girlfriend testified that defendant let the dogs run free both day and night. Based on the foregoing, we conclude that the State presented substantial evidence of defendant's intentional, willful, and wanton violation of the ordinance.

### III

[3] Defendant argues that, assuming he did violate Section 3-18, the State failed to show that such violation was the proximate cause of Prevette's death. Specifically, defendant contends that, in civil actions for injuries caused by dogs, absent a showing that the dog owner had actual or constructive knowledge of the vicious or dangerous propensities of his dog, there exists no owner liability for damages caused by the dog. It follows, according to defendant, that proof that the owner had knowledge or should have known of his animal's vicious propensities is a prerequisite to the imposition upon the owner of criminal liability for injuries caused by his dog. We disagree.

In the civil context, an owner of a domestic animal has the legal duty " 'to apportion the care with which he uses [the animal] to the danger to be apprehended from a failure to keep it constantly under control.' " *Lloyd v. Bowen*, 170 N.C. 216, 221, 86 S.E. 797, 799 (1915) (citation omitted). It is a breach of that legal duty, or negligence, to keep a domestic animal knowing that it has vicious propensities. *Id.* Proof that the owner had knowledge of his animal's vicious propensities is not, however, "always essential to a recovery" for damages caused by a domestic animal. *Id.* Negligence in the keeping of a domestic animal can be shown otherwise, for example, by an owner's violation of a safety ordinance requiring the fencing or leashing of domestic animals. *Id.; see also* 3 Fowler V. Harper *et al., The Law of Torts* § 14.11, at 274-75 (2d ed. 1986) (although animal not known to be vicious, there may still be liability to persons or goods if owner is negligent in his custody of it); *Lutz Indus., Inc. v. Dixie Home Stores*, 242 N.C. 332, 341, 88 S.E.2d 333, 339 (1955) (violation of statute designed for the protection of others is negligence *per se*). However, even if the owner of a domestic animal is in some manner negligent in the keeping of the animal, the owner may not be held civilly responsible for

STATE v. POWELL

[109 N.C. App. 1 (1993)]

any damage to persons or property caused by the animal unless " 'in the exercise of reasonable care, the [owner] might have foreseen that some injury would result from his act or omission, or that consequences of a generally injurious nature might have been expected.' " *Johnson v. Lamb*, 273 N.C. 701, 710, 161 S.E.2d 131, 139 (1968) (citations omitted); *Lloyd*, 170 N.C. at 221, 86 S.E. at 799. It is not necessary that the defendant should have foreseen the precise injury which occurs. *Johnson*, 273 N.C. at 710, 161 S.E.2d at 139. Although we agree with defendant that the requisite foreseeability can be established by showing that the owner had knowledge that his dog had vicious propensities, this is not the only evidence that will support a conclusion that the injury was foreseeable.

Accordingly, because in this criminal prosecution for involuntary manslaughter the State presented evidence that defendant intentionally violated an ordinance requiring all unattended dogs to be confined or restrained on the owner's property, the State is not required to prove that defendant's dogs had vicious propensities of which defendant had knowledge. Rather, the State is required, in order to meet its burden on the issue of proximate cause, to present substantial evidence that the dogs in fact caused Prevette's death and that "in the exercise of reasonable care, [defendant] might have foreseen that some injury would result" from his failure to abide by the ordinance. *Johnson*, 273 N.C. at 710, 161 S.E.2d at 139; *Kanoy v. Hinshaw*, 273 N.C. 418, 426, 160 S.E.2d 296, 302 (1968). The State presented evidence, including physical evidence, that defendant's dogs, running loose on the evening of 20 October 1989, attacked and killed Prevette. The evidence also established that Bruno and Woody, rottweilers weighing one hundred pounds and eighty pounds, respectively, were trained by defendant to be aggressive and to scare people. Defendant himself had witnessed the dogs growl at people and bolt toward a young child, and had been warned by a neighbor that the dogs were a liability. A reasonable juror could accept this evidence as supporting a conclusion that defendant's dogs caused Prevette's death and that defendant should have foreseen that his dogs, if left to run at large in violation of the city ordinance, could cause serious injury to someone. Therefore, there was substantial evidence that defendant's violation of the Winston-Salem ordinance was the proximate cause of Prevette's death.

STATE v. POWELL

[109 N.C. App. 1 (1993)]

Because the State presented substantial evidence that defendant intentionally violated a safety ordinance, and that such violation was the proximate cause of Prevette's death, the trial court properly submitted the charge of involuntary manslaughter to the jury. We have reviewed defendant's remaining assignments of error and have determined that either they are without merit, or they delineate errors which, in light of the overwhelming evidence of defendant's guilt, do not rise to the level of prejudicial error and therefore do not entitle defendant to a new trial.

No error.

Chief Judge ARNOLD concurs.

Judge WYNN dissents with separate opinion.

Judge WYNN dissenting.

For reasons other than those proffered by the majority, I believe the evidence was sufficient to be submitted to the jury, but, because I believe the trial judge failed to properly instruct the jury, I would grant the defendant a new trial.

The issues presented by this case are as follows: I. Whether the State presented sufficient evidence to require submission of the charge of involuntary manslaughter based on culpable negligence to the jury; and II. If so, whether the trial judge correctly instructed the jury on involuntary manslaughter based on culpable negligence.

I.

Involuntary manslaughter is a creature of common law defined as the unintentional killing of another human being without malice which killing proximately results from either 1) an unlawful act not amounting to a felony or not naturally dangerous to human life, or 2) a culpably negligent act or omission. *State v. McGill*, 314 N.C. 633, 637, 336 S.E.2d 90, 92 (1985); *State v. Everhart*, 291 N.C. 700, 702, 231 S.E.2d 604, 606 (1977). Typically, involuntary manslaughter convictions arising from the violation of a statute have been reviewed by our courts by first determining whether the statute at issue is a "safety" statute and, if so, examining the charge under the theory of culpable negligence. *See McGill*, 314 N.C. at 637, 336 S.E.2d at 92 (where the violation of a safety

STATE v. POWELL

[109 N.C. App. 1 (1993)]

statute or ordinance designed for the protection of life or limb is at issue, our courts examine a charge of involuntary manslaughter under a theory of culpable negligence). The violation of a safety statute constitutes negligence *per se*. *See Sellers v. CSX Transp., Inc.*, 102 N.C. App. 563, 566, 402 S.E.2d 872, 873 (1991). Such a violation can be elevated to culpable negligence in the criminal context where the violation is intentional, wilful, or wanton, evincing a reckless disregard of human life. *See State v. Cope*, 204 N.C. 28, 30, 167 S.E. 456, 458 (1933) (although criminal and culpable negligence are distinct concepts and should be recognized as such by the courts, culpable negligence has long been defined as "something more than actionable negligence in the law of torts"); *Everhart*, 291 N.C. at 702, 231 S.E.2d at 600 (same).

I disagree with the majority's characterization of the ordinance at issue here as a safety ordinance. Safety statutes and ordinances are those which "impose[ ] a duty on a person for the protection of others." *Hart v. Ivey*, 332 N.C. 299, 303, 420 S.E.2d 174, 177 (1992). The purpose of the subject Winston-Salem Code is to protect people from the minor annoyances posed from having someone else's pets roaming through your yard. There is no indication that the drafters of this ordinance contemplated that it would protect the lives and limbs of the citizens of Winston-Salem. The majority indicates that the protection of children from physical harm is a purpose of the statute that puts it in the realm of classification as a safety statute. However, this very type of limited protective classification was rejected in *Hart* wherein the Supreme Court found N.C.G.S. § 18B-302, a statute which prohibits the sale of alcohol to anyone under the age of twenty-one, to be a non-safety statute because it was not designed to protect the public. The Court held, "[i]f it was to protect the public, it should not be limited to persons under twenty-one years of age." *Id.* at 303-04, 420 S.E.2d at 177. Moreover, to hold that a violation of the subject leash law is negligence *per se* would require a trial judge to charge that even a minor violation by a domestic animal owner, even if it involves the meekest of domestic animals, is negligence *per se*. As in *Hart*, I do not believe the city council intended this result. I would therefore decline to classify this statute as a safety statute.

Having concluded that the subject statute is not a safety statute, it should be noted next that our appellate courts have not previously addressed the issue of how an involuntary manslaughter charge

arising from a non-safety statute should be analyzed. Nonetheless, it is clear that in the absence of a safety statute or ordinance, the analysis undertaken to prove involuntary manslaughter necessarily changes. Indeed, where there is a safety statute, the violation of the statute itself constitutes negligence *per se* and therefore no analysis of a common law duty and breach thereof must be undertaken. However, where there is a violation of a non-safety statute, no negligence is established by the mere violation of the statute, and the negligence, if any, must be established by proving common law negligence.

To meet its burden of establishing ordinary negligence, the State need not rely on elements that constitute a violation of the statute or ordinance. This point is clearly illustrated in *Hart* where the Supreme Court, after first finding that the statute in that case was not a safety statute, went on to find negligence under common law principles, without regard to the existence of the statute. *Id.* at 304-05, 420 S.E.2d at 177. "Actionable negligence is the failure to exercise that degree of care which a reasonable and prudent person would exercise under similar conditions." *Id.* at 305, 420 S.E.2d at 177-78. The *Hart* Court concluded that the jury could find that the defendants had done something a reasonable person would not do and were, therefore, negligent. *Id.* at 305, 420 S.E.2d at 178. The duty to others in such an instance is determined by the general common law principle that " '[t]he law imposes upon every person who enters upon an active course of conduct the positive duty to exercise ordinary care to protect others from harm, and calls a violation of that duty negligence.' " *Id.* (quoting *Council v. Dickerson's, Inc.*, 233 N.C. 472, 64 S.E.2d 551 (1951) ).

It follows that, because no safety statute governing the present situation exists, the analysis here should follow from accepted principles of common law. In general, the prosecution of the charge of involuntary manslaughter based upon culpable negligence where there is no safety statute requires proof of the following elements beyond a reasonable doubt: (1) that the defendant had committed or omitted acts which constituted ordinary negligence which were the proximate cause of the death of the victim; and (2) that the defendant's ordinary negligence was elevated to culpable negligence because his activity was wilful or wanton, evincing a reckless disregard for human life.

It is well established that the elements of ordinary negligence are: "(1) defendant owed a duty to plaintiff, (2) defendant failed to exercise proper care in the performance of that duty, and (3) the breach of that duty was the proximate cause of plaintiff's injury, which a person of ordinary prudence should have foreseen as probable under the conditions as they existed." *Westbrook v. Cobb*, 105 N.C. App. 64, 67, 411 S.E.2d 651, 653 (1992). However, this typical ordinary negligence test has not traditionally been applied in cases seeking recovery for the injuries inflicted by a domestic animal. Rather, in such cases, the plaintiff must show "[t]hat the animal was dangerous, vicious, mischievous or ferocious, or one termed in law as possessing a vicious propensity[,] . . . and that the owner or keeper knew or should have known of the animal's vicious propensity, character, and habits." *Miller v. Snipes*, 12 N.C. App. 342, 343, 183 S.E.2d 270, 271, *disc. rev. denied*, 279 N.C. 619, 184 S.E.2d 883 (1971). The essence of such an action is not negligence, but the wrongful keeping of an animal with knowledge of its viciousness. *Id.* at 346, 183 S.E.2d at 273. The liability in such an action, however, centers on the owner's negligence in failing to confine or restrain his animals. *Id.* This more specific analysis for cases dealing with vicious domestic animals, however, can be stated in terms of an ordinary negligence analysis. These cases support the conclusion that there exists a common law duty to restrain domestic animals which are known or should be known to possess vicious propensities. Failure to restrain such animals constitutes a breach of that duty if a reasonable person in the position of the owner would not have believed the measures taken by the owner to be adequate. In making such a determination of reasonableness, all relevant circumstances known to the owner, such as the animals' past behavior, size, nature and habits, should be considered. *Id.* Thus, to prove involuntary manslaughter in cases involving domestic animals, the State must prove the following beyond a reasonable doubt: (1) the animals at issue possessed vicious propensities and the owner knew or should have known of these vicious propensities; (2) the defendant breached his duty to restrain the animals; (3) the defendant's actions were wilful or wanton, evincing a reckless disregard of human life; and (4) the defendant's actions were the proximate cause of the victim's death.

In the subject case, the evidence regarding the vicious propensities of the rottweilers, viewed in a light most favorable to the State, tended to show the following. The dogs were large, extreme-

ly strong animals of substantial weight, they were trained to be aggressive and would bark at people who passed by the defendant's yard. On one occasion the dogs entered the yard of a neighbor, frightening the neighbor and his granddaughter, and at another time jumped on a woman walking down the street, but did not harm her. The defendant's ex-girlfriend testified that she lived with the defendant in 1988, for the first four months that he owned the then rottweiler puppies. She said that the defendant abused the dogs by kicking and hitting them and wanted the dogs to be aggressive. This evidence, in my opinion, was sufficient evidence for the jury to find beyond a reasonable doubt that the dogs possessed vicious propensities and that the defendant knew or should have known of the dogs' vicious propensities.

The evidence, as aptly set out by the majority opinion, was likewise sufficient for the jury to find that the defendant breached his duty to restrain the animals and that such actions were wilful or wanton, evincing a reckless disregard of human life. Finally, the evidence was sufficient to allow the jury to find that the defendant's actions were the proximate cause of the victim's death. In short, I conclude that the state presented sufficient evidence to submit this case to the jury.

## II.

The final issue which must be resolved in this appeal is whether the judge correctly instructed the jury on the charge of involuntary manslaughter. I conclude that he did not.

The trial court instructed the jury regarding culpable negligence as follows:

Second, the State must prove beyond a reasonable doubt that the defendant's conduct constituted culpable negligence. The violation of a statute or ordinance governing the care of dogs constitutes culpable negligence if the violation is wilful, wanton, or intentional. But where there is an unintentional or inadvertent violation of such statute or ordinance, such violation standing alone does not constitute culpable negligence.

The inadvertent or unintentional violation of such statute or ordinance must be accompanied by recklessness of probable consequences of a dangerous nature when tested by the rule of reasonable foresight amounting altogether to a thoughtless

disregard of consequences or a heedless indifference to the safety of others.

The defendant requested that the trial court instruct the jury as follows:

> You must look to the past conduct of the pets totally and completely unrelated to their locations and without any regard to any rules regarding running at large, and determine whether or not the past conduct of the pets cared for by the defendant Powell would give a person of ordinary intelligence notice that grievous bodily harm or death could occur by virtue of the pets being in the presence of humans. If you find that such evidence was submitted in the case, you may consider that evidence in reference to the question as to whether or not the defendant Powell should have reasonably been able to preview that probable consequences of a dangerous nature could occur by leaving his pets in an enclosed fence by virtue of their digging propensity.

> Violation of the County leash law does not negate the burden of claimants to show scienter in order to allege and prove that the defendant knew he was harboring vicious dogs prior to October 20, 1989.

The trial court is required to give a jury instruction requested by a party when such an instruction is correct and supported by the evidence. *Robinson v. Seaboard System Railroad, Inc.*, 87 N.C. App. 512, 526, 361 S.E.2d 909, 918 (1987), *disc. rev. denied*, 321 N.C. 474, 364 S.E.2d 924 (1988). These requested instructions need not be given in the exact form and language in which they are submitted, however, so long as they are given in substance. *Id.*

While the instructions requested by the defendant are not completely accurate, the trial judge should have instructed the jury regarding the elements of the charge of involuntary manslaughter in cases involving domestic animals where a non-safety statute is involved. These elements which have been previously set forth, encompass the essence of the defendant's request that the vicious propensities of the rottweilers were relevant to a determination of involuntary manslaughter.

Moreover, the instruction given by the trial judge was apparently based on the characterization of the subject leash law as a safety statute. Since I have concluded that the subject statute

was a non-safety statute, I believe it was error for the trial judge to instruct on involuntary manslaughter based on a safety statute.

For the foregoing reasons, I respectfully dissent and vote that this case be remanded to the trial court for a new trial.