STATE OF NORTH CAROLINA v. THOMAS ELLIS POWELL

No. 129A93

(Filed 29 July 1994)

1. **Animals, Livestock, or Poultry § 18 (NCI4th)— dog control ordinance—safety ordinance—involuntary manslaughter**

The State presented substantial evidence of each element of involuntary manslaughter based on culpable negligence where a safety ordinance was involved in that the evidence, including physical evidence, showed that defendant's dogs attacked and killed a jogger; the dogs were very large and aggressive; several witnesses testified that the dogs roamed the neighborhood at will; Forsyth Animal Control Officers had picked the dogs up on at least three occasions prior to their fatal attack; defendant had witnessed the dogs bolt towards a young child; and defendant had been warned by a neighbor that the dogs were a liability. The ordinance requiring that unattended dogs be restrained and restricted to the owner's property was designed to protect people as well as property; the fact that the ordinance serves a dual purpose does not make it any less a safety ordinance. Although the defendant contends the contrary, the provision in the ordinance requiring adequate fencing to prevent children from accessing a lot where dogs reside, by providing for the safety of the most vulnerable, provides a measure of safety for all, and allowing the owner to choose methods of restraint less effective than a fence still provides better protection than no restraint at all and recognizes that some owners may not need to incur the greater expense of a fence.

**Am Jur 2d, Animals § 114.**

2. **Homicide § 67 (NCI4th)— violation of dog control ordinance—safety ordinance—instructions**

The trial court did not err in a prosecution for involuntary manslaughter arising from the killing of a jogger by dogs by denying defendant's request for a jury instruction regarding the elements of involuntary manslaughter in cases involving domestic animals where there is no safety statute

or ordinance. The instruction was not supported by the evidence because a safety ordinance was involved.

**Am Jur 2d, Homicide §§ 91 et seq.**

Appeal by defendant pursuant to N.C.G.S. § 7A-30(2) from the decision of a divided panel of the Court of Appeals, 109 N.C. App. 1, 426 S.E.2d 91 (1993), affirming a judgment entered by Morgan, J., at the 10 September 1990 Criminal Session of Superior Court, Forsyth County. Defendant's petition for discretionary review of additional issues was allowed by the Supreme Court 6 May 1993. Heard in the Supreme Court 6 December 1993.

*Michael F. Easley, Attorney General, by Debra C. Graves and David F. Hoke, Assistant Attorneys General, for the State.*

*Malcolm Ray Hunter, Appellate Defender, by Teresa McHugh, Assistant Appellate Defender, for defendant-appellant.*

FRYE, Justice.

On 4 December 1989, defendant was indicted for involuntary manslaughter of Hoke Lane Prevette. The jury found defendant guilty of involuntary manslaughter based on culpable negligence by leaving dogs unattended when not restrained and restricted to the owner's property by a fence adequate to keep the resident dogs on the lot, in violation of Section 318 of the Winston-Salem Code. The trial court found as an aggravating factor that defendant had three prior convictions for criminal offenses punishable by more than sixty days confinement. The court made no finding of mitigating factors and imposed a sentence of five years imprisonment. From this judgment, defendant appealed to the Court of Appeals.

The Court of Appeals found no error in defendant's conviction, with one judge dissenting. Defendant appeals to this Court based on the dissenting opinion in the Court of Appeals and on the basis of our grant of defendant's petition for discretionary review of the following issues: (1) whether the evidence was sufficient to support a conviction of involuntary manslaughter and (2) what standards of law apply in a case involving a charge of involuntary manslaughter based on the acts of animals in order to establish the elements of the charge. We now affirm the decision of the Court of Appeals.

The evidence presented at trial tended to show that on 20 October 1989, Hoke Lane Prevette, a five-foot, one and one-half inch, ninety-four pound jogger, was attacked by defendant's dogs and died as a result of multiple dog bites. The dogs were away from defendant's property and had been loose earlier that day.

Defendant lived at 601 Banner Avenue in Winston-Salem. He owned two Rottweilers, "Bruno" and "Woody." Each dog was a little over one year old. Bruno weighed eighty pounds and Woody weighed one hundred pounds. On the evening of 20 October 1989 at approximately 9:00 p.m., Hoke Prevette left his home at 805 Salisbury Road in Winston-Salem to go jogging. At about 11:00 p.m., James Fainter and his wife returned to their home at 701 Cascade Avenue, discovered Prevette's body in their front yard, and notified the police. Detective L.E. Taylor of the Winston-Salem Police Department was the first officer to arrive at the Fainter residence. He determined that Prevette did not have a pulse.

Dr. John Butts, Chief Medical Examiner for the State of North Carolina, performed the autopsy of Prevette. Dr. Butts concluded that Prevette died as the result of multiple dog bites. Prevette's external injuries included shallow scrapes, deeper puncture wounds that extended down into tissue, evulsing skin, and skin torn away creating large holes in some places. His internal injuries included broken ribs on the left side and collapsed lungs. The cause of death was determined to be collapsed lungs, loss of blood, and choking.

David Moore, who lived at 641 Cascade Avenue, testified that he saw defendant's dogs when he arrived home at about 9:30 p.m. on 20 October. One of the dogs growled but both dogs relented when Moore stamped his foot. Another neighbor of the Fainters, Comfort Morton, encountered two Rottweilers he recognized as defendant's dogs earlier that evening when he drove his sister and sister-in-law home. He held the dogs at bay while the women entered the house.

After the discovery of Prevette's body, Winston-Salem Police Officer Jason Swaim went to defendant's house to investigate a report that defendant's dogs had been out that evening. When Swaim advised defendant that he wanted to see his dogs, defendant responded, "Oh my God, what have they done now?" Defendant admitted that his dogs had been out twice that day and that he

picked the dogs up in his automobile at approximately 9:00 p.m. at the intersection of Cascade Avenue and Dinmont Street.

The police seized the dogs, a dog dish, a portion of the wall in defendant's kitchen, the dogs' collars, and a portion of the back seat of defendant's automobile.

Robert Neill of the State Bureau of Investigation Crime Laboratory testified that six hairs removed from Prevette's clothing were canine; however, he could not match the hairs to a particular dog. An SBI forensic serologist found human blood on Woody's collar, on a sample of Woody's hair, on the dog dish, on a portion of the wall from defendant's home, and on defendant's car seat. According to the serologist, the blood could not be typed because of the presence of an inhibiting substance, possibly soap. A forensic odontologist testified that dental impressions taken from Bruno and Woody were compatible with some of the lacerations in the wounds pictured in scale photographs of Prevette's body.

Several witnesses testified to seeing Bruno and Woody running loose in the neighborhood prior to 20 October 1989 and to their aggressive behavior. Defendant's former girlfriend testified that defendant abused the dogs by kicking and hitting them.

Forsyth County Animal Control Officers picked up defendant's Rottweilers on at least three occasions prior to 20 October 1989. Christine Simms, a Forsyth County Animal Control Officer, was called to Acadia Avenue on 30 June 1989 on a complaint about a Rottweiler. The dog, Bruno, would not leave the complainant's porch. The complainant's own dog was inside the house and was "in heat." Simms returned Bruno to defendant and warned him to keep the dog on his property or on a leash.

Robert Walker, also a Forsyth County Animal Control Officer, discovered Bruno and Woody running loose on 26 July 1989. He stopped his truck, snapped his fingers, and both dogs jumped into his truck. Walker took the dogs to the shelter where defendant picked them up two days later. On 29 July 1989, after receiving a call from the police department, Walker went to defendant's residence and found one of defendant's dogs tied to a tree. When defendant returned home, Walker examined defendant's fence and together they detected the place where the dogs dug out. Walker advised defendant to fill the hole with cement.

On 16 August 1989, R.W. Swafford of the Forsyth County Sheriff's Department was dispatched to defendant's neighborhood on complaints about roaming dogs. When she arrived, Bruno and Woody were playing with each other on the sidewalk. Swafford snapped her fingers and the dogs got into her truck. She took them to the shelter and defendant picked them up four days later.

Animal Psychologist Donna Brown testified regarding an evaluation for aggressive propensities that she performed on Bruno and Woody in November 1989. She videotaped her testing and showed the videotape to the jury. Dr. Brown concluded that both dogs showed dominance and predatory aggression. She opined that an attack on a person would be consistent with her observations of Bruno's and Woody's behavior.

Animal Behavioralist Peter Borthelt testified for the defense that, although he had not evaluated the dogs, he had reviewed Dr. Brown's videotape and her results which he found to be ambiguous. He testifed that aggressiveness was only one possible interpretation of the dogs' behavior and that some of it could be labeled "play."

Defendant presented several witnesses who testified that Bruno and Woody were friendly and playful and responded to his commands to get down or sit. Other defense witnesses testified that the dogs were not aggressive when they were loose in the neighborhood.

William Foltz testified that he installed a privacy fence around defendant's house for $5,475.00 in 1988.

Dr. Thomas Dundon, Director of Public Health in Forsyth County, testified that defendant consented to have the dogs put to death after the attack on Prevette. In the consent agreement, the animal control officer indicated that the department had no information that the dogs had previously bitten anyone.

Additional evidence will be discussed as it becomes relevant to a fuller understanding of the specific issues raised on appeal.

The questions presented on appeal are: (1) whether there was sufficient evidence to submit the charge of involuntary manslaughter to the jury and (2) whether the trial judge erroneously instructed the jury on the charge of involuntary manslaughter. After careful review of the record and consideration of the briefs and arguments

of counsel, we conclude that there was sufficient evidence to submit the charge of involuntary manslaughter to the jury. We also conclude that the trial judge did not err in his instructions to the jury on involuntary manslaughter. Therefore, we affirm the decision of the Court of Appeals.

[1] By his first assignment of error, defendant contends that there was insufficient evidence to establish the essential elements of involuntary manslaughter; thus, the trial court erred in denying his motion to dismiss at the close of all the evidence. Involuntary manslaughter is the unlawful killing of a human being without malice, without premeditation and deliberation, and without intention to kill or inflict serious bodily injury. *See State v. Greene*, 314 N.C. 649, 336 S.E.2d 87 (1985). Involuntary manslaughter may also be defined as the unintentional killing of a human being without malice, proximately caused by (1) an unlawful act not amounting to a felony nor naturally dangerous to human life, or (2) a culpably negligent act or omission. *Id.* at 651, 336 S.E.2d at 88-89, *citing State v. Redfern*, 292 N.C. 319, 230 S.E.2d 152 (1976). "An intentional, willful or wanton violation of a statute or ordinance, designed for the protection of human life or limb, which proximately results in injury or death, is culpable negligence." *State v. Stewardson*, 32 N.C. App. 344, 350, 232 S.E.2d 308, 312, *cert. denied*, 292 N.C. 643, 235 S.E.2d 64 (1977) (quoting *State v. Cope*, 204 N.C. 28, 31, 167 S.E. 456, 458 (1933)). A death which is proximately caused by culpable negligence is involuntary manslaughter. *State v. Lane*, 77 N.C. App. 741, 292 S.E.2d 410 (1985).

In this case, the State sought to prove that defendant's willful, wanton or intentional violation of a safety statute or a safety ordinance was the proximate cause of the victim's death. The two bases of guilt submitted to the jury were as follows:

1. Guilty of involuntary manslaughter on the basis of culpable negligence by intentionally, knowingly, and willfully allowing dogs to run unaccompanied at large in the nighttime [in violation of N.C.G.S. § 67-21].

2. Guilty of involuntary manslaughter on the basis of culpable negligence by leaving dogs unattended when not restrained and restricted to the owner's property by a fence adequate to keep the resident dogs on the lot [in violation of Winston-Salem Code § 3-18].

The jury found defendant guilty on the second· basis. Thus, we limit our discussion to the willful, wanton or intentional violation of the Winston-Salem ordinance as the proximate cause of the victim's death.

Defendant contends that his motion to dismiss should have been granted because the evidence was insufficient to take the case to the jury. The law is well settled that

> [w]hen a defendant moves for a dismissal, the trial court must determine whether there is substantial evidence of each essential element of the offense charged (or a lesser offense included therein), and of the defendant being the one who committed the crime. If that evidence is present, the motion to dismiss is properly denied. *State v. Earnhardt*, 307 N.C. 62, 296 S.E.2d 649 (1982); *State v. Powell*, 299 N.C. 95, 261 S.E.2d 114 (1980). 'Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' *State v. Smith*, 300 N.C. 71, 78-79, 265 S.E.2d 164, 169 (1980) (citation omitted).

> In ruling on a motion to dismiss, the evidence must be considered by the court in the light most favorable to the State, and the State is entitled to every reasonable inference to be drawn from the evidence. *State v. Earnhardt*, 307 N.C. 62, 296 S.E.2d 649.

*State v. Stone*, 323 N.C. 447, 451-52, 373 S.E.2d 430, 433 (1988) (quoting *State v. Bullard*, 312 N.C. 129, 160, 322 S.E.2d 370, 387 (1984) ).

At the time of the attack on Prevette, a Winston-Salem ordinance provided:

> (a) No dog shall be left unattended outdoors unless it is restrained and restricted to the owner's property by a tether, rope, chain, fence or other device. Fencing, as required herein, shall be adequate in height, construction and placement to keep resident dogs on the lot, and keep other dogs and children from accessing the lot. One (1) or more secured gates to the lot shall be provided.

Winston-Salem Code § 3-18 (1989).

A safety statute or ordinance is one designed for the protection of life or limb and which imposes a duty upon members of society

to uphold that protection. *See Hart v. Ivey*, 332 N.C. 299, 303, 420 S.E.2d 174, 177 (1992); *State v. Cope*, 204 N.C. 28, 31, 167 S.E. 456, 458 (1933). According to the Court of Appeals and the State, Section 3-18 of the Winston-Salem Code "was designed to protect both the persons of Winston-Salem and their property, and thus is a safety ordinance." *State v. Powell*, 109 N.C. App. 1, 7, 426 S.E.2d 91, 94 (1993). The dissenting judge, on the other hand, concluded that the ordinance was not a safety ordinance, but was designed to "protect people from the minor annoyances posed from having someone else's pets roaming through your yard." *Id.* at 11, 426 S.E.2d at 97. Defendant contends that the ordinance is merely a nuisance law "designed to prevent roaming dogs from trespassing, damaging property, leaving waste in neighbors' yards and interfering with traffic."

After a careful reading of the ordinance, we conclude that it is designed to protect persons as well as property. Although it is silent as to its purpose, a logical reading of the ordinance leads us to conclude that it promotes the safety of persons as well as property. The ordinance provides that "no dog shall be left unattended outdoors unless it is restrained and restricted to the owner's property by a tether, rope, chain, fence or other device." It is without question that the ordinance has the effect of protecting property from damage by roaming dogs. However, the life and limb of pedestrians, joggers, and the public at large are protected by this ordinance as well. The ordinance protects people generally by confining the dogs to the owner's property while providing, in some cases, an adequate fence to keep animals and children from accessing the lot and being exposed to the dogs. The fact that the ordinance serves a dual purpose does not make it any less a safety ordinance.

The provision in the ordinance requiring adequate fencing (if chosen as the means of restraint) to prevent children from accessing a lot where dogs reside is further evidence that the ordinance promotes the safety of persons. However, defendant argues, consistent with the dissent, that this provision supports the position that Section 3-18 is not a safety ordinance. Defendant and the dissent rely on this Court's decision in *Hart v. Ivey*, 332 N.C. 299, 420 S.E.2d 174.

In *Hart*, this Court held that the plaintiff's complaint stated a cognizable claim under common law principles of negligence by

**STATE v. POWELL**

[336 N.C. 762 (1994)]

alleging that the defendants served alcoholic beverages to a person whom they knew or should have known was under the influence of alcohol and would drive an automobile on the streets or highway shortly after consuming the alcoholic beverages. However, a majority of this Court declined to hold defendants liable in damages to plaintiffs on the theory of negligence per se based on defendants' violation of N.C.G.S. § 18B-302 which prohibits, among other things, giving alcoholic beverages to anyone less than twenty-one years old. The majority concluded that N.C.G.S. § 18B-302 was not "a public safety statute which was intended to protect the plaintiffs," *id.* at 303, 420 S.E.2d at 177, but instead it was intended to stop persons under the statutory age from drinking alcoholic beverages.

Following the majority's reasoning in *Hart*, that if N.C.G.S. § 18B-302 was intended to be a public safety statute it would have applied to persons of all ages, the dissenting judge reasoned that the Winston-Salem ordinance was not intended to be a safety ordinance because of the "limited protective classification" of children. Viewed properly, the special provision requiring fencing to be adequate to keep children from accessing the lot is not "limited protective classification," as suggested by defendant and the dissent, but instead a recognition of the special vulnerability of children which warrants the extra protection provided by the ordinance.

The ordinance in question is all inclusive. It provides that "no dog shall be left unattended outdoors unless it is restrained and restricted to the owner's property by a tether, rope, chain, fence or other device." Dog owners are required to comply with the ordinance, without regard to whether their dogs are vicious or docile. The ordinance requires that if fencing is the method chosen to restrain dogs, then the fencing "shall be adequate," not only to "keep resident dogs on the lot" but also adequate to "keep other dogs and children from accessing the lot." This requirement applies to the "height, construction and placement" of the fencing. By providing for the safety of the most vulnerable persons, children, this ordinance provides a measure of safety for all persons.

Defendant also argues that the ordinance does not promote safety because an owner may choose methods of restraint that are less effective than a fence. Assuming *arguendo* that the use of a tether, rope, chain or other device is not as effective as the use of a fence for restraining dogs, it is still far better protection than no restraint at all. Additionally, the flexibility allowed dog

owners in choosing the method of restraint is a recognition that some property owners may not need to incur the greater expense of a fence in order to restrain their dogs.

Based on the foregoing reasons, we agree with the Court of Appeals that Section 3-18 "was designed to protect both the persons of Winston-Salem and their property, and thus is a safety ordinance." *Powell*, 109 N.C. App. at 7, 426 S.E.2d at 94.

The evidence that defendant intentionally, willfully, or wantonly violated the safety ordinance was aptly set out by the Court of Appeals.

> Bruno and Woody had been picked up by animal control officers on at least three occasions prior to the fatal attack. The dogs had been taken by animal control officers to the animal shelter as recently as August, 1989, two months prior to the death of Prevette. Defendant admitted that his dogs had been out twice on the day of Prevette's death. On one occasion in July, 1989, after the dogs escaped by digging out from underneath the fence, defendant simply covered the escape hole with a cooler after returning the dogs to the fence. Defendant's next-door neighbor testified that the dogs were allowed to run loose "on a regular basis," day and night, and that defendant would often "just open the door and let the dogs out." Defendant's ex-girlfriend testified that defendant let the dogs run free both day and night.

*Id.* at 7-8, 426 S.E.2d at 95. The trial judge instructed the jury that "the violation of a statute or ordinance governing the care of dogs which results in injury or death will constitute culpable negligence if the violation is willful, wanton, or intentional." Viewed in the light most favorable to the State, as we must on a motion to dismiss, we find that the State presented sufficient evidence that defendant intentionally, willfully, or wantonly violated the ordinance.

Additionally, the State presented sufficient evidence that defendant's intentional, willful or wanton violation of the ordinance was the proximate cause of the victim's death.

> Proximate cause is a cause that produced the result in continuous sequence and without which it would not have occurred, and one from which any man of ordinary prudence could have foreseen that such a result was probable under all the facts as they existed. *Jenkins v. Electric Co.*, 254 N.C.

553, 119 S.E.2d 767. Foreseeability is an essential element of proximate cause. *Pinyan v. Settle*, 263 N.C. 578, 139 S.E.2d 863; *Pittman v. Swanson*, 255 N.C. 681, 122 S.E.2d 814. This does not mean that the defendant must have foreseen the injury in the exact form in which it occurred, but that, in the exercise of reasonable care, the defendant might have foreseen that some injury would result from his act or omission, or that consequences of a generally injurious nature might have been expected. *Slaughter v. Slaughter*, 264 N.C. 732, 142 S.E.2d 683; *Bondurant v. Mastin*, 252 N.C. 190, 113 S.E.2d 292.

*Williams v. Boulerice*, 268 N.C. 62, 68, 149 S.E.2d 590, 594 (1966).

Relying on cases involving a civil suit for damages, defendant contends that the State must prove that he had knowledge of his dogs' vicious propensities in order to establish foreseeability in this criminal prosecution. *See Swain v. Tillett*, 269 N.C. 46, 152 S.E.2d 297 (1967); *Hunt v. Hunt*, 86 N.C. App. 323, 357 S.E.2d 444, *aff'd*, 321 N.C. 294, 362 S.E.2d 161 (1987). We agree, however, with the Court of Appeals that in a criminal prosecution where the State has presented sufficient evidence that defendant intentionally, willfully or wantonly violated a safety ordinance, "the State is required, in order to meet its burden on the issue of proximate cause, to present substantial evidence that the dogs in fact caused Prevette's death and that 'in the exercise of reasonable care, [defendant] might have foreseen that some injury would result' from his failure to abide by the ordinance." *Powell*, 109 N.C. App. at 9, 426 S.E.2d at 96 (citations omitted). Under these circumstances, knowledge of the dogs' vicious propensities is not the only evidence that will support a conclusion that injury was foreseeable.

Viewed in the light most favorable to the State, the evidence, including physical evidence, showed that defendant's dogs attacked and killed Prevette. The dogs were very large and aggressive. Several witnesses testifed that the dogs roamed the neighborhood at will. Forsyth Animal Control Officers had picked the dogs up on at least three occasions prior to their fatal attack. Defendant had witnessed the dogs bolt towards a young child and had also been warned by a neighbor that the dogs were a liability. Therefore, we conclude that the State presented substantial evidence that defendant's intentional, willful or wanton violation of the safety ordinance was the proximate cause of the victim's death.

**STATE v. POWELL**

[336 N.C. 762 (1994)]

For the foregoing reasons, we hold that the State presented substantial evidence of each element of the offense of involuntary manslaughter based on culpable negligence where a safety ordinance is involved. Accordingly, this assignment of error is rejected.

[2] Defendant next argues that the trial court erroneously instructed the jury on the charge of involuntary manslaughter. Defendant's request for a jury instruction regarding the elements of involuntary manslaughter in cases involving domestic animals where there is no safety statute or ordinance was denied. Instead, the trial court instructed the jury regarding culpable negligence where a safety statute or ordinance *is* involved. It is well settled that the trial court must give a requested instruction in substance if the instruction is correct and is supported by the evidence. *State v. Corn,* 307 N.C. 79, 296 S.E.2d 266 (1982). Here, the instruction is not supported by the evidence as we have held that a safety ordinance *is* involved in this case. Therefore, the trial court committed no reversible error in refusing to instruct the jury as requested by defendant.

The decision of the Court of Appeals is affirmed.

AFFIRMED.