No. 81,243

STATE OF KANSAS, *Appellee,* v. SABINE M. DAVIDSON, *Appellant.*
(987 P.2d 335)

Opinion filed July 9, 1999.

*Keith C. Sevedge,* of Lenexa, argued the cause and was on the briefs for appellant.

*Chris E. Biggs,* county attorney, argued the cause, and *Carla J. Stovall,* attorney general, was with him on the brief for appellee.

The opinion of the court was delivered by

ALLEGRUCCI, J.: Defendant Sabine Davidson was convicted of reckless second-degree murder and endangering a child. She appeals her conviction of reckless second-degree murder in the death of 11-year-old Christopher Wilson, who was killed by defendant's Rottweiler dogs. The appeal was transferred from the Court of Appeals on this court's motion, pursuant to K.S.A. 20-3018(c).

On appeal, defendant argues that her conduct did not constitute reckless second-degree murder in law or in fact. The question we must resolve is whether Davidson's conduct constituted reckless second-degree murder as defined in K.S.A. 1998 Supp. 21-3402(b),

and, if so, whether the State presented evidence sufficient to sustain a conviction of reckless second-degree murder.

Davidson's challenge to the law and the evidence rests on the same premise: that the State proved only that she failed to confine her dogs. K.S.A. 1998 Supp. 21-3402(b) requires the State to prove that her conduct "manifest[ed] extreme indifference to the value of human life." At best, she argues that her conduct constituted a negligent omission to confine the dogs and she should have been charged with involuntary manslaughter. Simply stated, she argues that the crime of second-degree murder does not fit her conduct.

We are struck by Davidson's lack of candor concerning her conduct relevant to Chris' death. The State's evidence established Davidson's conduct consisted of much more than a failure "to confine the family's dogs." She conveniently ignores significant aspects of her conduct that contributed to the tragic death of Chris.

The State's evidence established numerous earlier incidents involving defendant's dogs. A woman who babysat for defendant in the summer of 1995 testified about two incidents involving defendant's dogs. On one occasion the witness, who had been told it would be all right to do so, let a German shepherd out of its cage, and the shepherd attacked a puppy. When the sitter intervened, the shepherd "snipped" at her. On another occasion, a Rottweiler puppy belonging to the Davidsons nipped at their 3-year-old daughter's calves, leaving teeth marks and making her cry. When told about it, defendant laughed.

Fifteen-year-old Margaret Smith, who lived near the Davidsons, testified that sometime during the 1995-96 school year, two dogs chased her and Jeffrey Wilson away from the school bus stop as they waited there in the morning. She believed that the dogs belonged to the Davidsons. Jeffrey remembered only one dog involved in that incident. It was a Rottweiler, and he was certain it belonged to the Davidsons. He also testified that he rode fast when bicycling past the Davidson house because the dogs inside the fence were big and they jumped and barked "like they wanted to attack us."

Deputy Shumate had been to the Davidson house in January 1996 when one of the neighbors complained about their dogs run-

ning loose. The complainant said that his wife was afraid of the dogs, a German shepherd and a Rottweiler. When Shumate went to the Davidson house on that occasion, Sabine Davidson told him that she would keep the dogs in the fenced enclosure. The fenced enclosure that Shumate saw in January 1996 was still in use in April 1997.

Learie Thompson, who lives near the Davidsons, complained to the sheriff's office in January 1996 because the Davidsons' dogs were in his yard. He recalled three to five times earlier when the dogs were loose and came into his yard. For the most part, the dogs Thompson saw in his yard were German shepherds. Thompson testified that he was afraid of the Davidsons' dogs because they were big and aggressive toward people. When the dogs were in their fenced enclosure, they would rage and growl and try to get out of the fence. For some time after he complained to the sheriff, Thompson did not see the dogs outside their fenced enclosure. Then early on the morning that Chris was killed, as Thompson opened his garage door to leave for work, the Davidsons' three Rottweiler dogs rushed into the garage. Thompson jumped up onto his truck. The dogs stood on their hind legs and growled and bared their teeth at him for several minutes. Responding to Thompson's cries, his wife activated the garage door mechanism. It made a noise as it was engaging, and the dogs ran away.

Eleven-year-old Daniel Stevens recalled an incident in the spring of 1996 when he and Chris were riding their bicycles and were chased by two barking Rottweilers. In January 1997, he was chased by one Rottweiler when he was riding his bicycle. Both times the dogs ran as far as the turn in the road and then went back to the Davidsons' house.

One incident occurred at the intersection where Chris was killed. On June 14, 1996, Tony Van Buren, who lives directly across the street from the Davidson house, was out in his front yard in the evening when he heard dogs barking. He saw three Rottweilers forming a semicircle around two young children, who were approximately 3 to 5 years old. As the children moved, the dogs moved, too, and maintained a consistent distance. He ran into his house, told his wife to call the sheriff, and got a pistol and a ball

bat. Yelling as he went, Van Buren ran toward the dogs and children. When he got about halfway there, the dogs turned and went up to the Davidson house. The gate to the fenced enclosure was open approximately 4 to 6 inches. Van Buren opened it more and the two smaller dogs went in. Van Buren tried to coax the third dog through the gate, but it barked and growled at him and then disappeared around the house. When the sheriff's deputy arrived, Van Buren talked with her for a little bit. The third dog returned to the fenced area, and Van Buren was able to open the gate and get the dog to go in. Van Buren went to the Davidsons' door and rang the bell. No one answered. He also tried to telephone them, but their line had been disconnected. On one other occasion before Chris was killed, Van Buren saw a Rottweiler out of the Davidsons' fenced enclosure. At another time, he observed a fight start among the dogs as defendant tried to quiet them in the enclosure. Since the Davidsons had gotten the Rottweilers, Van Buren had observed the dogs in the fenced enclosure bark aggressively whenever someone went by on foot or bicycle or skate board. Before that, the Davidsons had German shepherds in the garage, and they barked at all hours. At one time, because of the number of adult dogs and litters of puppies kept by the Davidsons, Van Buren complained to the zoning office that the Davidsons were unlawfully operating a kennel.

Roy Bossard lives approximately a half mile north of the Davidsons. About 6 weeks before Chris was killed, Bossard was out at his kennels feeding his hunting dogs when he saw two Rottweilers nearby. The larger one was a female. When Bossard hollered at the dog to go away, it "came alert" and started growling while walking toward him with its teeth bared. He picked up a half brick, threw it, and struck the dog in the shoulder. Bossard ran to the house to get a gun. He saw the dog running in a southerly direction.

The night before Chris was killed, four big black dogs were running loose and came into Charles Dale Baker's yard when he went out to secure his own dog for the night. It was approximately 8:30 to 9 o'clock. The dogs came from the direction of the Davidsons' house, which is approximately 500 yards away, and they returned in the same direction.

A co-worker of Mr. Davidson drove him home on several occasions. She had seen the Davidsons' Rottweilers from the time they were puppies, and she noted that they were "getting bad" as they grew up. On several occasions, the Rottweilers jumped on her car and were growling and showing their teeth despite being called back by defendant. The co-worker was afraid to leave her car. She expressed her concern to defendant, who responded that the dogs were only playing.

Rebecca Davis, who taught basic obedience classes for dogs in Junction City, was hired by defendant in 1993 to go to defendant's house to train her German shepherds. Later, after defendant had acquired the Rottweiler called Dunja, Davis accompanied defendant to a session of the Schutzhund club in Salina.

Schutzhund is a dog sport developed in Germany that involves tracking, obedience, retrieving, and protection work. In protection work, the dog attacks an "agitator." The agitator wears a protective suit and padded sleeve. The dog is taught to bite the sleeve and hold on, even when being hit by the agitator's stick, until the handler gives the command "out." Bridget Bernardi, who used to train Schutzhund dogs in Germany, testified that her experiences with Schutzhund clubs in this country had not been positive because participants lacked knowledge about the sport and that their dogs' biting conduct seemed more aggressive and less like a game.

Tom Brenneman has competed in the sport of Schutzhund in Europe and the U.S. since 1981. He has trained approximately 600 police service dogs. According to Brenneman, Schutzhund dogs must be kenneled alone to avoid development of pack behavior and to ensure that a dog's relationship with its handler is its primary relationship. Schutzhund dogs should be socialized extensively to many different people and surroundings. The risk created when a dog is improperly handled and only partially trained for Schutzhund is that its prey drive will exceed the handler's control. In other words, the likelihood of the dog acting aggressively is increased.

Ed Frawley breeds police service dogs, is the canine handler for a sheriff's department in Wisconsin, and produces dog training videotapes. One of his videos, "Bite Training Puppies," was pur-

chased by defendant in 1995. He testified that unless bite training is coupled with obedience training, it can be dangerous. He also said that dogs should never be kept more than two together in order to avoid pack behavior.

Defendant took various German shepherds and Rottweilers that belonged to her to meetings of Schutzhund clubs in Kansas and Oklahoma. Debbie Lutz, president and training director of the Tornado Alley Schutzhund Club in Topeka, testified that defendant attended one session. Defendant brought a dog that was not crated as it should have been. Robert Armstead, president and training director of an Oklahoma City Schutzhund club, testified that defendant attended several sessions of the club in 1996. She brought two German shepherds and one Rottweiler. Her handling of her dogs "was very, very poor." She focused exclusively on the protection work aspect of Schutzhund and completely ignored obedience and tracking. She left an impression on club members for wearing red pumps rather than footwear that would have allowed her to control her dogs. Dale Johnson of the Salina Schutzhund club testified that she had only very limited control of her dogs and that twice they got away from her and attacked other dogs. Johnson testified that defendant's application for membership in the Salina club was voted down in June 1995 because she could not get along with other club members; she lacked control of her dogs, which were unkempt, dirty, and stinky; and on one occasion she attended a club meeting with a puppy that died the next day of Parvo, a very contagious disease. With regard to the Parvo incident, defendant testified that she had not taken a sick dog to the club, but that due to the highly contagious nature of Parvo, she had warned club members she had a sick dog at home. Nelson Rivera, a Junction City police officer and canine handler, was an officer of the Northeast Schutzhund club in Topeka when defendant attended several sessions with her German shepherds. Rivera testified that defendant was very irresponsible in that she did not bring her dogs in crates, she did not have water for them, and she failed to keep them on leashes.

In addition to keeping and breeding German shepherds, defendant in 1995 began purchasing Rottweilers. Bernardi testified

that defendant bought three from her, five from other kennels, and one from a breeder in Germany.

Timothy Himelick testified that defendant bought two Rottweilers from him. Himelick's dogs were 2 years old, had been raised together as family dogs, and were very friendly. He sold them because he was moving, but several months later "repossessed" the dogs because defendant could not control the female. He went to defendant's house at her request because she could not get the female to come out of its cage. Himelick testified that there was a wound on the female dog's nose and that both his dogs had lost weight, more than 20 pounds in the female's case. Himelick testified that three noteworthy incidents occurred while he was at defendant's house: When defendant got close to Himelick's female dog, the dog "went ballistic." When two children rode by on bicycles, defendant said, "One of these days I'm going [to] get even with them." And when asked by Himelick about a German shepherd that obviously had had a litter of puppies, defendant said her Rottweilers had eaten the pups.

Davis, the obedience trainer, testified that when one of defendant's Rottweilers was about 6 months old, it nipped at her heels and pant legs. Davis used a nose pinch, an accepted training technique for correcting inappropriate puppy behavior, and defendant told her to stop before she ruined her Schutzhund pup. Davis advised defendant that Schutzhund dogs might not be good family dogs and to get professional help if she wanted to do that type of training. Defendant gave Davis the video titled "Bite Training Puppies," so that Davis could gain a better understanding of Schutzhund.

When Bernardi sold the second dog to defendant, she added to her standard sales contract a provision that required the purchaser to socialize and train the dog in basic obedience and not to let it run free. The extra provision was added due to Bernardi's concerns about defendant's letting the first dog she had gotten from Bernardi run loose. Later, Bernardi witnessed one of the dogs knocking the gate open and both dogs getting out. At that time, she told defendant to put a chain on the gate.

Rivera, the Junction City police officer, testified that rag training puppies builds their confidence to go after something and bite it. That training eventually progresses to commanding a dog to attack a bite sleeve or someone in a bite suit. Several people testified that they had seen a man wearing a large padded sleeve working with a dog or dogs in the Davidsons' yard. James Walls, a neighbor, saw a man working there with a German shepherd. Defendant was there, too. Walls did not think the man was defendant's husband. Pamela Jean Strong saw people who looked like the Davidsons in the backyard with three Rottweilers. The man was wearing a sleeve like the one she had seen used in training police dogs, and the dogs were attacking the sleeve. Sandra Christenson, a neighbor, saw Mr. Davidson in his front yard one night near Christmas 1996 with something bulky covering one of his arms.

On the day Chris was killed, April 24, 1997, at approximately 6:45 a.m., a neighbor, Mary Smith, saw three Rottweiler dogs that belonged to defendant sitting outside the Smiths' fence. When the Smiths' dogs were brought in the house, defendant's dogs left. When Smith drove by the Davidson house later, she estimated the time at approximately 7:30 a.m. She saw that the dogs were back inside the fence, and the gate was closed.

About 7 a.m. on April 24, 1997, Walls opened his front door to let his dog back into the house. Three Rottweilers had his dog backed into a corner of the porch. Walls' dog acted scared. Walls' dog slipped into the house, and the Rottweilers advanced toward Walls. He went back inside for his gun, and when he returned a few minutes later, they were gone. Walls went outside where he could see that the Rottweilers were back inside the Davidsons' fenced enclosure.

As Wanita Hulett, another resident of the neighborhood where the Davidsons lived, left for work that morning at approximately 7:10 to 7:15, she saw three Rottweilers running loose.

At 7:17 a.m., according to the clock in her car, Barbara Hutfles had to stop her car on the highway that runs by the subdivision in which the Davidsons lived. She saw three Rottweilers cross and recross the road.

Violet Wilson dropped her two younger sons, Chris, 11, and Tramell, 9, off at the school bus stop shortly after 7:15 a.m. The bus stop was located near the residences of Tony Van Buren and defendant. While waiting for the bus, Tramell noticed that defendant's dogs were digging at the fence like they "really wanted to get out." When the dogs got out of the fence, they ran toward the boys, who climbed up into a tree in Van Buren's yard. The three dogs surrounded the tree and barked at the boys for several minutes before the biggest dog left and the other two followed it.

Chris wanted to get down out of the tree and see where the dogs had gone and what they were doing. Tramell urged him to stay in the tree, but Chris got down and looked around for the dogs.

When the school bus arrived at 7:30, no children were at the stop, but the driver noticed two book bags and a musical instrument had been left there. The driver saw Tramell up in a tree on Van Buren's lot. Tramell got out of the tree, ran to the bus stop, gathered up the bags and instruments, and got on the bus. As he got on, Tramell said something about Chris, which the driver thought sounded like Chris had run the dog home. The driver waited several minutes before repositioning the bus to let Chris know that he needed to hurry up. After moving the bus, the driver could see in the side mirror that there were three large black dogs down in the ravine. The dogs appeared to be fighting over something; they were jumping back and forth and thrashing their heads from side to side. One of the children on the bus said, "It looks like they have a rag doll." Then the driver realized that the dogs had Chris. The only movement of Chris' body was that caused by the thrashing motion of the dogs.

The driver began honking the bus horn in an effort to distract the dogs, and she radioed the dispatcher. There were approximately 20 children on the bus, and the driver then made an effort to divert their attention away from the ravine and to calm them.

When David Morrison, a sheriff's deputy, arrived, the bus driver told him that the boy and the dogs were in the ravine. As Morrison walked toward them, the dogs noticed him and moved quickly and steadily in his direction. Morrison could see that Chris was not moving. Morrison's shouts and gestures did not divert the dogs,

which continued to move straight toward him with a large male in the lead. Morrison could see blood on the lead dog's face and forelegs. When the lead dog was approximately 15 feet away from him, Morrison shot and killed him. One of the children on the bus testified that the lead dog had been the one at Chris' neck.

The other two dogs began to run away. Another officer, Sergeant Mataruso, who had just arrived, fired shots at the fleeing dogs. Morrison ran down into the ravine and found Chris. The boy had no pulse. The grass around his body was torn up, and there was a lot of blood spread around the area. Items of clothing, some ripped up, and shoes were scattered about.

When Deputy Shumate arrived, he saw a dead dog in the road. Mataruso told him that he had shot at, and probably wounded, another dog that had been seen running toward a house. Shumate went to the Davidson house, where he found the wounded dog and killed it. Shumate told Mr. and Mrs. Davidson that a child had been attacked by their dogs; he then arrested them. They asked no questions about the identity or condition of the child. Inside the house, there was a dog confined in a large plastic pet carrier. Shumate testified that "the dog was growling, sort of barking, and moving the pet carrier all over the floor like it was trying to get out of the carrier to get at me." The third dog was shot and killed by a highway patrolman later in the day.

An autopsy revealed that Chris had died as a result of trauma from animal bites. There were many injuries, but those affecting the head and neck were immediately responsible for his death. The boy's esophagus and carotid artery were torn. His neck had been broken, and the bones splintered and crushed.

A forensic dentist, Daniel Winter, attended the autopsy and took impressions of bite wounds. He also took impressions of the teeth of the dead dogs. He believed that the male dog inflicted the neck wounds, and he demonstrated at trial how the victim's neck was engulfed by the dog's mouth so that even the dog's back teeth left impressions in the tissue.

The dogs that killed Chris were Rottweilers. The one killed by Morrison was an 80-pound male. The other two were females of 70 pounds and 54 pounds, respectively.

The Rottweiler that was confined in a crate inside the Davidsons' house when police went there after Chris' death was placed in the Junction City police kennel. When a kennel worker approached its cage, the dog "went nuts," forcefully lunging at the gate and showing her full set of teeth. When defendant was told of the incident, she laughed. Later, while the dog was housed at the humane society, a friend of the Davidsons took his young daughter with him to check on the dog. The dog's behavior was unlike what he had observed when it was at the Davidsons' house. It charged at the fence, and they "could see her back molars." The man was so scared that his knees felt rubbery and his heart pounded. Tom Brenneman tested the dog and found that it had had very little obedience training, but that it had some Schutzhund protection training and bit the bite sleeve hard.

In addition to finding the Rottweiler inside the house, police found books, magazines, catalogues, and videotapes on the subject of Schutzhund. There was a catalogue of Schutzhund protective gear. A puppy-breeding setup occupied the basement of the house.

Jeffrey and Sabine Davidson had three young children, who were cared for by Sheri Barnett for approximately a month when the Davidsons were taken into custody. Barnett was acquainted with the Davidsons from working at a bowling alley which they frequented. The oldest child, Vicky, was 8 years old at the time of trial. She told Barnett that her 2-year-old sister, Ashley, was playing on the kitchen floor when one of the Rottweilers tried to bite her. Her dad threw the dog up against the wall.

Defendant told police that she let the dogs out about 6:30 a.m. on April 24, 1997. Then she took a sleeping pill and went to sleep on the living room couch. Later, when she was told that her dogs had attacked a boy, she said, "The dead one should be one of the Wilson boys." She said that the Wilson boys teased her dogs whenever they came around her property so that the dogs barked and got aggressive when the boys were in the area. She also said that the boy had been at the bus stop, and that is how she knew who was attacked.

Defendant told police that she and her husband had discussed putting a chain on the gate to the fenced enclosure because the

dogs got out of that gate "all the time." There was no chain on the gate, however. At trial, defendant testified that after Bernardi watched one of the Rottweilers open the gate by lifting the latch, she put a padlock through the hole in the latch so that it could not be lifted. Defendant testified that after padlocking the latch, she had no more reports of the dogs getting out.

A videotape made by Deputies Snyder and Popovich shows that the Davidsons' back and side yards are enclosed by a 6-foot-tall chain link fence. The gate fastening device is a typical horseshoe-shaped hinged latch. In a horizontal position the arms of the latch are on either side of an adjacent upright fence post on which the next section of fence is attached. A locked padlock through the hole in the latch on the Davidsons' gate kept the latch in a horizontal position. The fence post along with the latch should have kept the gate closed, but the post was easily moved far enough from the vertical for the latch to slip past. On the videotape, Snyder opened and closed the "padlocked" gate without much effort. The manager of the fence company that installed the fence and gate testified that the posts were set in concrete. After watching the videotape, he testified that it looked like the post had been loosened because dirt had been dug out around the concrete footing of it. With regard to the latch, he said, "[I]t would appear that over the course of time it had widened from probably . . . considerable pressure being put on the gate while the latch was in the closed position." The fence was installed in 1993.

Reckless second-degree murder, also known as depraved heart murder, was defined by the legislature as "the killing of a human being committed . . . unintentionally but recklessly under circumstances manifesting extreme indifference to the value of human life." K.S.A. 1998 Supp. 21-3402(b).

*State v. Robinson*, 261 Kan. 865, 934 P.2d 38 (1997), is the only case considered by this court to date that illustrates conduct within the scope of 21-3402(b). Robinson used a weapon in an extremely reckless way. He killed Richard Crowley, who was the initial aggressor, by hitting him in the head with a golf club. Crowley, angry about his sons being threatened by some boys, armed himself with a baseball bat, chased the boys, and swung the bat at them. The

boys grabbed golf clubs out of someone's conveniently located bag and turned the tables on Crowley, who began to use the bat defensively. When one of the boys fell, Crowley hit him with the bat. The other boys closed in on Crowley, and Robinson hit Crowley in the head, killing him.

"Robinson testified that he was not trying to hit Crowley in the head, but was trying to hit Crowley in the arms in order to make him stop hitting [the fallen boy] with the bat. Robinson testified that he could not remember if his eyes were open or shut when he hit Crowley." 261 Kan. at 868-69.

This court rejected Robinson's challenge to the constitutionality of 21-3402(b) and concluded that a rational factfinder could have found him guilty of reckless second-degree murder. 261 Kan. at 877, 881-82.

Robinson also argued that only involuntary manslaughter, not reckless second-degree murder, can apply when excessive force is used in self-defense or defense of others. The court noted the jury had found all elements of depraved heart murder were met and concluded that the jury had not found such an imperfect defense-of-others situation existed. 261 Kan. at 882. The court stated:

"Robinson struck Crowley in the head with the golf club, even though his friend, whom Crowley had struck with a bat, was getting up off of the ground and was no longer in danger. While Robinson testified that he did not aim at any particular part of Crowley's body, the State called a medical expert to the stand who testified that the golf club hit Crowley's head with direct force and was not deflected off any other part of Crowley's body. The jury could have inferred from this testimony that Robinson intentionally aimed for Crowley's head. Even if the jury did not find such intent, the jury could have found that blindly swinging a golf club at a person with great force constitutes extreme recklessness 'manifesting an extreme indifference to the value of human life.' " 261 Kan. at 881.

The State indicates that there is no precedent in this state for convicting a person of homicide for a killing committed by his or her dogs, but it cites *State v. Bowers*, 239 Kan. 417, 721 P.2d 268 (1986), for a case involving "battery by dogs." In *Bowers*, the court reviewed the defendant's conviction of aggravated battery against a law enforcement officer. An element of aggravated battery was that the unlawful touching be done with a deadly weapon or in a manner that could inflict great bodily harm. At the defendant's

urging, his Doberman pinscher dogs attacked the police officer who was trying to take the unruly and resisting defendant into custody. The defendant argued that his dogs were not deadly weapons. After reviewing cases from other states on the question of a dog as a deadly weapon, the court concluded that the offense had been committed because "the Dobermans were used in a manner whereby great bodily harm could be inflicted." 239 Kan. at 425.

The State cites other jurisdictions in which dog owners have been convicted of manslaughter for killings committed by their dogs. No case has been cited, nor are we aware of a case, where a dog owner has been convicted of second-degree murder. Obviously, the existence of such cases would depend upon whether other states have second-degree murder statutes similar to 21-3402(b).

In *Munn v. State*, 158 Fla. 892, 30 So. 2d 501 (1947), defendant's conviction of manslaughter was upheld for the killing of a woman by defendant's dogs. Fla. Stat. § 782.12 (1941) provided:

" 'If the owner of a mischievous animal, knowing its propensities, shall willfully suffer it to go at large, or shall keep it without ordinary care and such animal while so at large or not confined kills any human being, who shall have taken all the precautions which the circumstances may permit to avoid such animal, such owner shall be deemed guilty of manslaughter.' " 158 Fla. at 893.

Munn bred and raised pit bull dogs, which on numerous prior occasions, including an attack on horseback riders the morning of the crime, had viciously attacked numerous people. At the time of the attack, he kept his dogs in an enclosure "from which the dogs could go almost at will." 158 Fla. at 893.

In *State v. Powell*, 109 N.C. App. 1, 426 S.E.2d 91 (1993), defendant's two Rottweilers had killed a jogger. The jury verdict of involuntary manslaughter was affirmed on the ground that the prosecution presented substantial evidence that defendant had intentionally violated a safety ordinance and that the violation was the proximate cause of the victim's death. The city ordinance provided that "[n]o dog shall be left unattended outdoors unless it is restrained and restricted to the owner's property." 109 N.C. App. at 3. The defendant's dogs were known for their propensity for digging out of their enclosure and running unrestrained. There also

was evidence that defendant regularly let the dogs out so that they could run loose. Defendant's former girlfriend testified that he abused the dogs, encouraged them to growl at people, and "consulted with an attack school because he wanted the dogs to be aggressive." 109 N.C. App. at 5. The appellate court stated that the evidence could support a conclusion "that defendant should have foreseen that his dogs, if left to run at large in violation of the city ordinance, could cause serious injury to someone." 109 N.C. App. at 9.

In *Turnipseed v. State*, 186 Ga. App. 278, 367 S.E.2d 259 (1988), defendant's three pit bull terriers had killed a child. The appellate court affirmed Turnipseed's conviction of involuntary manslaughter based on the underlying misdemeanor of reckless conduct. His reckless conduct was failing to adequately secure the dogs even though he knew that they had escaped on many prior occasions and that they could be vicious. Turnipseed lived and kept his dogs in a residential area where there were many children. The evidence also showed the following:

"He felt the dogs did not have to be trained to be protective, that they were born that way and that '[a]ll you got to do is keep them off from around people and they won't like nobody but the people who feed them.' Turnipseed stated that he tried to keep the dogs away from other people. He strapped weights to the dogs and ran them to build up their chests and their legs. He had been told by his neighbors, policemen, and animal control officers that his dogs were a problem. Turnipseed knew that his dogs had been getting out of his house and outside of his yard and how they were accomplishing this. The animals were able to escape the house on numerous instances because of missing or broken doors, windows, etc. Turnipseed thought his dogs were capable of jumping a seven-foot fence. He never put a lock on the fence gate. The dogs fought with each other and Turnipseed knew that they had chased people in the neighborhood including children and had tried to kill another animal. He also knew that two of his dogs had been shot and killed by police officers because the dogs had attacked the officers. Turnipseed himself shot one of the dogs for trying to bite." 186 Ga. App. at 280.

Here, defendant argues that 21-3402(b) is not applicable to her conduct. In her view, the State's evidence establishes only that she failed to secure the dogs. She then argues that her conduct, as a matter of law, is not reckless second-degree murder. K.S.A. 1998

Supp. 21-3402(b) clearly defines the crime, and in *Robinson* this court just as clearly held that depraved heart second-degree murder differs from manslaughter in degree but not in kind. Neither the legislature nor the court has restricted the application of 21-3402(b) as defendant contends. All that is required is reckless conduct under circumstances manifesting extreme indifference to the value of human life. Defendant was properly charged with violation of 21-3402(b). She does not challenge the statute but, rather, attempts to limit the issue to her view of the evidence and create an issue of law. The State correctly points out that the only issue is whether the State's evidence is sufficient to support the verdict of the jury. Thus, we do not have unlimited review as suggested by the defendant. We restated the proper standard of review in *State v. Claiborne*, 262 Kan. 416, 425, 940 P.2d 27 (1997):

" 'When the sufficiency of the evidence is challenged in a criminal case, the standard of review is whether, after review of all the evidence, viewed in the light most favorable to the prosecution, the appellate court is convinced that a rational factfinder could have found the defendant guilty beyond a reasonable doubt.' *State v. Knighten*, 260 Kan. 47, Syl. ¶ 1, 917 P.2d 1324 (1996)."

Defendant's argument in law and in fact is based on the State's failure to establish a "depraved heart scienter." It is difficult at times to follow her arguments, but she seems to imply that the State has failed to prove foreseeability, *i.e.*, that she had knowledge the dogs would attack someone, let alone harm or kill someone. Thus, she argues the State failed to prove that her conduct was inherently dangerous to human life and that she was indifferent to that danger. In her view, her conduct did not rise to that level of reckless conduct manifesting an extreme indifference to the value of human life.

A similar argument was rejected in both *Turnipseed* and *Powell*. In *Turnipseed*, 186 Ga. App. 278, the court rejected the defendant's attempt to inject the rules of civil liability, *i.e.*, foreseeability, in determining a criminal responsibility. The Georgia Court of Appeals affirmed the trial court, holding that it was not necessary for the jury to find the defendant " 'knew of the dogs' propensity to do the particular act which caused the death in this case, that is,

attack, bite and injure a small child' " in order to return a guilty verdict. 186 Ga. App. at 281.

In *Powell*, the North Carolina Court of Appeals stated: "It is not necessary that the defendant should have foreseen the precise injury which occurs." 109 N.C. App. at 9. The court further held that in a prosecution for involuntary manslaughter,

"the State is not required to prove that defendant's dogs had vicious propensities of which defendant had knowledge. Rather, the State is required, in order to meet its burden on the issue of proximate cause, to present substantial evidence that the dogs in fact caused [the victim's] death and that 'in the exercise of reasonable care, [defendant] might have foreseen that some injury would result' from his failure to abide by the ordinance. [Citations omitted.]" 109 N.C. App. at 9.

Here, defendant argues that all she did was let the dogs into the fenced area, take a pill, and go to sleep. This argument conveniently ignores significant aspects of her conduct that contributed to the tragic death of Chris. The State presented evidence that she selected powerful dogs with a potential for aggressive behavior and that she owned a number of these dogs in which she fostered aggressive behavior by failing to properly train the dogs. She ignored the advice from experts on how to properly train her dogs and their warnings of the dire results which could occur from improper training. She was told to socialize her dogs and chose not to do so. She ignores the evidence of the dogs getting out on numerous occasions and her failure to properly secure the gate. She ignored the aggressive behavior her dogs displayed toward her neighbors and their children. The State presented evidence that she created a profound risk and ignored foreseeable consequences that her dogs could attack or injure someone. The State is not required to prove that defendant knew her dogs would attack and kill someone. It was sufficient to prove that her dogs killed Chris and that she could have reasonably foreseen that the dogs could attack or injure someone as a result of what she did or failed to do.

Davidson was charged with reckless second-degree murder. The jury was instructed that in order to establish the charge, it would have to be proved that defendant killed Christopher Wilson "unintentionally but recklessly under circumstances showing extreme indifference to the value of human life." "Recklessly" was defined

as "conduct done under circumstances that show a realization of the imminence of danger to the person of another and a conscious and unjustifiable disregard of that danger." The jury also was instructed that it could consider the lesser included offense of involuntary manslaughter, either an unintentional killing done recklessly or an unintentional killing done in the commission of the offense of permitting a dangerous animal to be at large. The jury found that defendant's conduct involved an extreme degree of recklessness.

In *Robinson*, the court stated that "[r]ecklessness that can be assimilated to purpose or knowledge is treated as depraved heart second-degree murder, and less extreme recklessness is punished as manslaughter." 261 Kan. at 877-78. Here, the evidence, viewed in a light most favorable to the State, showed that defendant created an unreasonable risk and then consciously disregarded it in a manner and to the extent that it reasonably could be inferred that she was extremely indifferent to the value of human life. The evidence was sufficient to enable a rational factfinder to find Davidson guilty of reckless second-degree murder. Thus, the district court properly submitted the charge of reckless second-degree murder to the jury, and the evidence was sufficient to support the jury's verdict.

The judgment of the district court is affirmed.