No. 83,716

STATE OF KANSAS, *Appellee*, v. GENTRY E. BOLTON, *Appellant*.

(49 P.3d 468)

Opinion filed July 12, 2002.

*Janine Cox*, assistant appellate defender, argued the cause, and *Craig Durham*, assistant appellate defender, and *Jessica R. Kunen*, chief appellate defender, were with her on the briefs for appellant.

*Jerome A. Gorman*, assistant district attorney, argued the cause, and *Nick A. Tomasic*, district attorney, and *Carla J. Stovall*, attorney general, were with him on the brief for appellee.

The opinion of the court was delivered by

LOCKETT, J: Gentry Bolton appeals his conviction of premeditated first-degree murder and aggravated robbery. He was sentenced to a term of life (hard 25) on the murder charge and 89

months for the aggravated robbery charge. The aggravated robbery sentence was ordered to run consecutive to the life sentence. Bolton claims the trial court (1) violated his right to confrontation by allowing the jury to view a surveillance videotape in the jury room during deliberations; (2) erred in failing to instruct the jury on lesser included offenses; and (3) erred in finding the State articulated race-neutral reasons for using peremptory strikes to remove African-Americans from the jury pool.

On December 28, 1997, Shane Brees was working as a clerk at a convenience store in Kansas City, Kansas. Also working that afternoon was the shift supervisor, Robin Thebo. Thebo was doing electronic ordering, which caused to her to go back and forth from the store area to the manager's office. Brees was working the cash register.

At the time of the robbery, three customers were in the store or using telephones outside the store. Tanya Yearout entered the store, greeted Brees, and then went to the pop and candy aisles. Jim Freeman was using one of the pay telephones on the outside of the building to the right of the front doors, so he had parked near that telephone. Norma Carson was using one of the pay telephones on the outside of the building to the left of the front doors.

While using the telephone, Freeman noted a car, gray in color and driven by a young man, back up onto the curb next to him. Freeman could not see any tags on the car. Freeman assumed the car was stolen. The young man exited the gray car, left the car running, and went into the store.

Thebo exited the manager's office to relieve Brees. As she walked down an aisle toward the register island, she heard someone say, "[G]ive me all your money." Thebo knew the voice was not Brees'. She stopped and peered through the plexiglass sides of a display case to observe. Thebo saw a man on the other side of the counter pull a gun and point it at Brees. She observed the right side of the gunman's face. The gunman was a black man wearing a dark knit stocking cap and a dark-colored shirt and pants. He was clean-shaven with short hair. Thebo turned to go back to her office to call for help. As she went though her office door, she heard a shot. Thebo locked the door and called 911. After a short time, she

left the office, went to the front of the store, and found Brees dying on the floor near the register. Brees was gasping for air, and his eyes were closed. The cash register was open.

Yearout also observed the confrontation between Brees and the man. As Yearout was walking toward the Sunday newspapers, she heard a customer say, "[O]h, shit." Yearout made eye contact with the man, but because she thought he was angry or very cold, she did not think there was any danger. As she reached for a Sunday newspaper, she heard the man say, "[G]ive me all your God damn money." Yearout looked up and observed the cash register drawer open and Brees' hand in the drawer. She observed Brees back up and heard the sound of money being transferred. Yearout then heard a shot and threw herself onto the floor.

Carson, who was talking on the outside telephone, heard the shot and turned to look into the store. She observed Brees fall to the floor. She watched a man walk casually out of the store, mumbling something about being right back. The man walked to the gray car backed up to the front of the store.

Freeman heard a popping sound. He then observed the man who had been driving the gray car leave the store and return to his car carrying a wad of money and a pistol.

Brees was transported to the hospital where he died as a result of a gunshot wound to the chest. The bullet had entered Brees' chest; penetrated his heart, aorta, and the boney portion of his spine; and exited the back.

Officers at the scene found a single spent .380 caliber casing in an area behind Brees. Officers were unable to locate the bullet. The bullet, which was located on January 7, 2000, by a convenience store employee, was a .380 caliber bullet. The police did not attempt to recover fingerprints because witnesses reported that the robber wore gloves into the store. There was a video camera mounted in the store. The camera had recorded the robbery. The manager gave the tape to the police, and the police reviewed the tape.

Officer Phillip Burger was dispatched later in the evening after the robbery occurred to check out a vehicle in the Sedonia Points Apartments which matched the description of the vehicle the gun-

man had used in the robbery of the convenience store. When Burger arrived, the headlights were in the "on" position and the battery was dead. Burger looked in the vehicle and found a black ankle holster, a right-handed black glove, and a red scarf. The car was processed for fingerprints. None of the prints found matched Bolton's. The car had been reported stolen on December 26, 1997.

During the investigation, Thebo, Yearout, and Carson were separately shown a photo line-up. Each identified Bolton as being the gunman in the robbery. Each of them also later identified Bolton at trial. Based on the line-up identifications, Kansas City, Kansas, police searched for Bolton. They enlisted the aid of the Federal Fugitive Apprehension Task Force. When police learned Bolton was calling a girl in Kansas City, a subpoena was obtained to secure telephone records from a telephone tap. On January 5, 1998, the federal task force went to a Kansas City address, found Bolton, and arrested Bolton without incident.

Bolton was tried to a jury on a second amended information charging Bolton with premeditated first-degree murder, felony murder in the alternative, and aggravated robbery. The jury found Bolton guilty of premeditated first-degree murder and aggravated robbery. Bolton appeals. Our jurisdiction is pursuant to K.S.A. 22-3601(b)(1).

## VIEWING OF SURVEILLANCE VIDEOTAPE

The surveillance videotape of the robbery was admitted at trial without objection. The tape was played to the jury in open court with the defendant present. After the jury began deliberations, it requested to once again view the surveillance tape. Outside Bolton's presence, but in the presence of his counsel and counsel for the State, the trial court requested that a VCR and television be placed in the jury deliberation room so that the jury could view the tape. Bolton's counsel did not object.

A criminal defendant has the constitutional and statutory right to be present at all critical stages of his or her trial. See K.S.A. 2001 Supp. 22-3405(1); *Illinois v. Allen*, 397 U.S. 337, 25 L. Ed. 2d 353, 90 S. Ct. 1057, *reh. denied* 398 U.S. 915 (1970). Bolton contends that the trial court committed reversible error because it did not

inquire of him personally whether he waived his right to be present during the replaying of the videotape. He asserts he had a constitutional and statutory right to be present during the viewing and was prejudiced by not being present because the videotape was emotionally charged critical evidence.

Bolton's argument that the highly prejudicial nature of the videotape (a recording in real time of a murder) made the jury's repeated viewing of it unfair is not persuasive. The emotional impact of the videotape was unavoidable and undoubtedly felt by the jury at the initial viewing of the tape in open court where the defendant was present to mitigate the emotional impact in whatever manner possible. It cannot be assumed that the jury's viewing of the tape again in the jury room compounded the emotional impact, resulting in undue prejudice.

K.S.A. 22-3420(3) provides:

"After the jury has retired for deliberation, if they desire to be informed as to any part of the law or evidence arising in the case, they may request the officer to conduct them to the court, where the information on the point of the law shall be given, or the evidence shall be read or exhibited to them in the presence of the defendant, unless he voluntarily absents himself, and his counsel and after notice to the prosecuting attorney."

Because the videotape was "evidence arising in the case," Bolton also contends he had a right under K.S.A. 22-3420(3) to be present when the tape was played back to the jury.

The application of K.S.A. 22-3420(3) typically arises where, after retiring for deliberations, the jury submits questions to the court regarding clarification on a point of law, see, *e.g.*, *State v. Coyote*, 268 Kan. 726, 731-34, 1 P.3d 836 (2000); where the jury requests a readback of testimony, see, *e.g.*, *State v. Miller*, 268 Kan. 517, 527, 997 P.2d 90 (2000); and where there have been ex parte communications between the judge and members of the jury, see, *e.g.*, *State v. Rayton*, 268 Kan. 711, 717, 1 P.3d 854 (2000). This court has consistently held that K.S.A. 22-3420(3) explicitly requires that any questions from the jury concerning the law or evidence pertaining to the case must be answered in open court in the defendant's presence unless the defendant is voluntarily absent. *Coyote*, 268 Kan. 726, Syl. ¶ 2. The defendant's right to be present extends

to any communication between the trial court and the jury. *State v. Bell,* 266 Kan. 896, 920, 975 P.2d 239, *cert. denied* 528 U.S. 905 (1999).

Here, the videotape was an exhibit which had been admitted into evidence during the course of the trial and had been played in open court before the jury and the defendant. A videotape is distinguishable from readback testimony in that the evidence on a videotape is static and is not susceptible to inflection or interpretation by a reader; regardless of the number of times a videotape is replayed or who plays the videotape, the message conveyed on the tape is the same.

In *State v. Fenton,* 228 Kan. 658, 667, 620 P.2d 813 (1980), Fenton contended that the trial court erred in allowing the jury to view exhibits a second time prior to its deliberations with only the bailiff supervising the viewing. We found that once a case is submitted to the jury, the jury is ordinarily given the exhibits to take into the jury room where the jurors can examine the exhibits as many times as they desire. The *Fenton* court noted that the manner in which exhibits are handled at trial is within the trial court's discretion, and the exercise of that discretion will not be disturbed on appeal except in cases of abuse. Fenton demonstrated no prejudice as a result of a second viewing. 228 Kan. at 667; see also *State v. Poulos & Perez,* 230 Kan. 512, 514, 639 P.2d 477 (1982) (no abuse of discretion in permitting jury to listen, in the jury room, to an audiotape recording that was an admitted exhibit).

Therefore, we find a jury's second viewing of exhibits admitted into evidence is not subject to the requirements of K.S.A. 22-3420(3). Bolton was not denied his right to confrontation.

## FAILURE TO INSTRUCT ON LESSER INCLUDED OFFENSES

The trial court instructed the jury to consider intentional second-degree murder as a lesser included offense of premeditated first-degree murder. Bolton had also requested the trial court instruct the jury to consider reckless second-degree murder and involuntary manslaughter as lesser included offenses of premeditated first-degree murder. The trial court refused to do so. Bolton contends

that the trial court's refusal to instruct on reckless second-degree murder and involuntary manslaughter is reversible error.

The standard of review for a claim of failing to instruct on lesser included crimes is whether the evidence, when viewed in the light most favorable to the defendant, supports an instruction on the lesser included crime. See *State v. Jones*, 267 Kan. 627, 633, 984 P.2d 132 (1999). The instruction need not be given, however, if the evidence would not permit a rational factfinder to find the defendant guilty beyond a reasonable doubt of the lesser included offense. *State v. Deavers*, 252 Kan. 149, 151, 843 P.2d 695 (1992), *cert. denied* 508 U.S. 978 (1993).

Although Bolton's defense was misidentification, he argues that the jury could have rejected that defense and believed he was guilty of the convenience store robbery and the killing of Brees but could have found that the killing of Brees was unintentional and reckless. The evidence Bolton points to in support of a reckless theory is the surveillance videotape of the crime. He asserts that the videotape depicts an individual who approaches the sales counter, leaps onto the counter, and grabs cash from the cash register. He contends that the videotape shows that as the individual leaps and grabs, the gun goes off and hits Brees in the chest. He argues that the combination of leaping onto the counter and grabbing the money from the register, while holding a loaded weapon pointed at the clerk, makes it possible that the gun accidently fired. He contends that if the jury believed that he was the robber, it could have concluded that his behavior was reckless rather than intentional.

The State relies on *State v. Bailey*, 263 Kan. 685, 952 P.2d 1289 (1998), to demonstrate that an argument similar to Bolton's has previously been rejected by this court. In *Bailey*, the defendant argued that even though he pointed the gun at the victim and pulled the trigger, he did not intend to kill the victim. In other words, he argued that an intentional act done without regard to consequences is reckless. This case is distinguishable, however, as Bolton does not argue that he pointed the gun and squeezed the trigger and unintentionally killed Brees. Instead, he argues that from the videotape evidence, the jury could have believed that the

gun accidently discharged when he jumped upon the counter and grabbed the money from Brees.

Reckless second-degree murder and involuntary manslaughter are unintentional killings that require reckless behavior. They differ only in the degree of recklessness required to prove culpability. *State v. Davidson*, 267 Kan. 667, Syl. ¶ 2, 987 P.2d 335 (1999).

We have reviewed the videotape and find, as the district judge found, that if the jury believed Bolton was the robber depicted on the tape, the tape does not support a reasonable inference that the shooting was accidental. Trial court testimony supports our interpretation of the events on the tape. A customer in the convenience store at the time of the robbery and shooting testified that she saw and heard money change hands and saw Brees back away from the register. It was not until after the customer saw Brees back away that she heard a gunshot and threw herself on the floor. The trial judge was correct in finding that there was no evidence presented at trial to support a finding that Bolton recklessly shot Brees during the robbery.

## *BATSON* CHALLENGE

During jury selection, defense counsel informed the court that he wanted to assert a *Batson* challenge, stating:

"[DEFENSE COUNSEL]: Okay. I noted that the State, I believe, struck six African Americans half of their challenges for cause.

"THE COURT: What are the numbers of the jurors?

"[DEFENSE COUNSEL]: Number 16 was State's strike, number two —

"THE COURT: Just give me the number of the jurors.

[Counsel gives juror numbers.]

"THE COURT: Okay, Let me review those and see if there's a pattern.

"[DEFENSE COUNSEL]: Okay.

"THE COURT: I have reviewed the jurors that you mentioned and frankly have seen from my own notes obvious reasons for them to be removed from this panel. Based upon that and the other strikes from both sides, I can't see a pattern of discrimination displayed by the State in this case. I have reviewed each of your objections to these particular jurors with my own notes and I can find no pattern of discrimination whatsoever. And, therefore, I'm going to deny your *Batson* objections at this point.

"[DEFENSE COUNSEL]: Okay."

Bolton asserted that he presented a prima facie case regarding the State's use of peremptory challenges to strike African-American jurors. He contended that the trial judge erred when the judge did not require the prosecutor to state race-neutral reasons for its peremptory strikes of African-Americans. The State argued that a fair reading of the voir dire questions showed that the entire panel was treated equally and that none of the State's questions or actions were gauged to exclude African-Americans. The State asserted that we should rely on the trial court's experience in presiding over many trials and voir dires, and trust the trial judge's independent review of the peremptory strikes.

*Batson v. Kentucky,* 476 U.S. 79, 90 L. Ed. 2d 69, 106 S. Ct. 1712 (1986), held that a State's privilege to strike jurors though peremptory challenges is subject to the 14th Amendment Equal Protection Clause of the United States Constitution. 476 U.S. at 89. We conduct a three-step test in assessing whether a peremptory challenge violates the Equal Protection Clause under *Batson. State v. Walston,* 256 Kan. 372, 377, 886 P.2d 349 (1994). First, the defendant must make a prima facie showing that the prosecution has used peremptory challenges on the basis of race. Second, once such a showing has been made, the burden shifts to the prosecutor to articulate a race-neutral reason for striking the juror. Third, the trial court then decides whether the defendant has carried the burden of establishing purposeful discrimination. *Batson,* 476 U.S. at 96-98; *State v. Edwards,* 264 Kan. 177, 192, 955 P.2d 1276 (1998). Whether a prima facie showing has been made that the challenges were racially based is a question of legal sufficiency subject to plenary review. *State v. Sledd,* 250 Kan. 15, 21, 825 P.2d 114, *cert. denied* 506 U.S. 849 (1992).

The *Batson* analysis was elaborated on in *Purkett v. Elem,* 514 U.S. 765, 131 L. Ed. 2d 834, 115 S. Ct. 1769 (1995), and that analysis was adopted by our court in *State v. Vargas,* 260 Kan. 791, 795, 926 P.2d 223 (1996). Under these cases, unless discriminatory intent is inherent in the prosecutor's explanation, the reason given will be deemed race neutral. The second step does not require an explanation that is persuasive, only one that is facially valid, because that is not where the validity of the strike is considered. It is at the

third step where the burden of persuasion regarding the improper motivation for the strike rests with the opponent of the strike. The judge should determine if the opponent of the strike has shown and proved purposeful discrimination. The ultimate burden of persuasion rests with, and never shifts from, the opponent of the strike. *Purkett*, 514 U.S. at 767-68, *Vargas*, 260 Kan. at 795.

In this case, because the trial judge failed to make the required findings, the matter was remanded to the district court for a proper *Batson* hearing or a new trial. See *State v. Bolton*, 271 Kan. 538, Syl. ¶ 4, 23 P.3d 824 (2001). A *Batson* hearing was conducted on October 25, 2001, over 2½ years after Bolton's trial. The district court held the first step of the *Batson* analysis had been met when Bolton identified six African-Americans who were removed by the State through exercise of peremptory challenges. After hearing the prosecutor's reasons for exercising the strikes and after hearing argument from both sides, the district court found Bolton had not met his burden in proving that the challenges were racially motivated. A reviewing court gives great deference to findings of the district judge in actions of this nature because the findings turn upon evaluation of the credibility of the prosecutor. *State v. Alexander*, 268 Kan. 610, 619, 1 P.3d 875 (2000); *Walston*, 256 Kan. at 378.

### Juror 16 - L. Richmond

At the *Batson* hearing, the prosecutor contended that Richmond was struck because she had returned late from a break. The trial transcript indicates that Richmond returned late from the lunch break during voir dire, claiming that she was unable to find a parking spot. The prosecutor asserted that Richmond was also struck because she was a church janitor and because she had family members involved in a shooting 2 years before voir dire (her brother had shot her mother). The prosecutor claimed to be especially concerned with how Richmond would react, under the circumstances, to seeing the surveillance videotape of the shooting in this case.

The State also noted in its brief that Richmond, when asked during voir dire if she had any ill will against the criminal justice

system, replied, "Well, kind of sort of." When asked to clarify her response, however, Richmond indicated that she did not harbor any ill will against the agencies and the system.

Bolton asserted to the district court that his notes indicated that Richmond's brother had been in a mental institution 2 years prior to voir dire. Bolton also noted that Juror 34, P. Reed, who had not been struck from the panel, also had a family member who had had contact with law enforcement. Reed's husband had transported drugs prior to their marriage and had done time in prison.

### Juror 31 - M. Berry

The prosecutor asserted to the district court that Berry was struck because she knew another juror on the panel, Juror 15, M. Smith. The prosecutor contended that he disapproved of having people on a jury who know each other. Berry was also allegedly struck because the prosecutor had, a few years before, lived very close to her. The prosecutor was concerned that although he did not recognize Berry, she might at some point during the 5-day trial be influenced as a result of his having lived in the same neighborhood, through conversations with neighbors.

Bolton rebutted the prosecutor's explanation in part by claiming that another juror, Juror 28, A. Valdez, who was not struck, also knew another juror on the panel, Juror 14, M. Oropeza.

The State, in its brief, refutes Bolton's contention that jurors were treated differently, by alluding to the fact that the reason the State did not strike Valdez is because Oropeza had already been struck. It cannot be determined from the record which party struck Oropeza from the panel. The State contends the reason for removing a juror for knowing another juror on the panel is negated when either juror is struck. This reasoning is consistent with the prosecutor's assertion at the hearing that he did not like to have people on a jury who know each other.

It must be noted that Smith, unlike Valdez, did not serve on the final jury and was also struck by the State. The State notes, however, that at the time Berry was struck, Smith was still a member of the panel. The situation with Berry and Smith differed because Berry was struck for knowing Smith and then Smith was struck for

a different reason. Although this may have been an orchestrated move by the prosecution, there is no indication that jurors in the same situation were treated differently. Additionally, there were other reasons why Berry was struck.

The State also points out in its brief that Berry made comments at voir dire that raised suspicion as to her ability to keep emotions and other outside influences from entering her decision. When asked whether any juror did not feel he or she would be able to be fair and impartial with observers in the courtroom, Berry indicated she was feeling "sympathy." Berry stated:

> "At this time, I really feel that I could [*sic*] be impartial—I mean, I just don't think I could. I just feel, therefore, a lot of emotion now and it's—I feel sick.
>
> . . . .
>
> "Sick, I don't—I feel that I don't want to do it. I don't want to make—"

Later, when asked whether Berry could wait to hear all the evidence before deciding the case, Berry responded, "I—I'm not sure. I think I could, but I wouldn't want to." Berry also stated, however, that if she took an oath she would try to do her best to hear all the evidence before making her decision.

### Juror 12 - E. Lasley

The prosecutor asserted that Lasley was struck because Lasley indicated he had gone to school with an Ed Bolton and Lasley was unaware of whether Ed was a relative of Gentry Bolton. Bolton did not refute the State's basis for striking Lasley at the hearing.

In his brief, Bolton cites to the fact that Lasley was struck from the panel even though the prosecutor did not know if Ed Bolton and Gentry Bolton were related. The State asserts, however, that it is in the State's best interest to strike any person who might be good friends with a relative of a defendant.

### Juror 15 - M. Smith

The prosecutor asserted that Smith was removed because he had indicated he had a back problem. The trial was scheduled to last 5 days. The prosecutor claimed he thought it would be better to have people who were comfortable throughout the trial rather than take

the chance of the need for additional recesses or a possible mistrial because of the back problems of this particular juror.

Bolton's counsel admitted that he did not have an independent recollection of whether the State or the trial court had sufficiently questioned Smith about how burdensome it would be for him to serve as a juror or whether the court had offered any alternative arrangements. Bolton contended, however, that the issue was not sufficiently explored to justify the State's using Smith's back problem as the reason for striking him.

During voir dire, Smith indicated he had back surgery about a year ago, was on social security disability as a result of his back injury, and that the bench on which he was sitting was hurting his back. Upon moving to the padded chairs he would be seated in if a member of the jury, Smith indicated that he would not have a problem sitting during the trial.

The State asserts that attention and patience are important aspects for a juror and that the State should not be required to learn in the middle of trial that a juror is having back problems and may or may not have heard all the evidence.

### Juror 32 - M. Bryant

The prosecutor asserted that Bryant was struck from the panel because of a recent situation in which her granddaughter's father had been charged or had had certain experiences with drugs. He also contended Bryant was struck because she was retired from the Social Security Administration and because she was doing maintenance work at the Johnson County Juvenile Detention Center. The prosecutor stated that her position at the detention center put her in contact with criminally charged juveniles and made it impossible for the State to determine her position on individuals who might be similarly situated to the young defendant in this case. Bolton was over 18 years of age at the time.

Bolton contended the prosecutor had been referring to the situation in which Bryant's granddaughter's father was charged with a drug offense and for which Bryant had had some contact with the father's attorney. Bolton cited to the fact that the husband of Juror 34, P. Reed, had been also been arrested on a drug offense

and served time prior to their marriage, but that Reed had not been struck by the State. It must be noted that the record does not indicate Reed's race.

The State accurately points out in its brief that seven persons on the jury other than Bryant had either been, or knew someone close to them who had been, charged with a crime. Two of these individuals, in addition to Reed, knew someone who had been charged with a drug-related offense. Of all these individuals, all but Reed and one other, C. Boland, were struck by the State. The defense struck Boland. The State asserts that Reed differs from the others because her husband was charged, convicted, and served time for his offense prior to Reed knowing him. The other jurors were all related or friends at the time the charge was made.

Bolton points out in his brief that Bryant was not employed by the Johnson County Juvenile Detention Center, but instead that it was Juror R. Hicks' husband who was so employed. The State concedes this point in its brief, asserting that during voir dire the note was incorrectly made beneath Bryant's name. The State claims Bryant and Hicks were seated next to each other in the courtroom and were listed next to each other on the prosecution's worksheet. The veracity of these statements is unknown, however, as no seating chart or copy of the prosecution's worksheet was included in the record on appeal.

### Juror 4 - L. Green

The prosecutor noted to the court that Green was a "fairly young black male" and asserted that Green was removed because he wore hair braids. At the time the crime was committed in this case, the defendant had also worn hair braids. The prosecutor claimed that he was concerned that because no other members of the panel wore hair braids, Green would bond with the defendant, or Green might develop a concern about possible negative connotations that might be drawn about individuals with hair braids. The prosecutor rationalized that he was down to his eleventh strike at this point, stating that he had to start looking at "stereotypes" and that hair braids "stuck out."

Bolton argued that the presence of hair braids was not a race-neutral reason for striking Green. He claimed that this bordered on being a racial argument because Green had this particular type of hair because he is African-American and because the defendant and Green shared this same racial characteristic.

In its brief, the State asserts this was not a racial characteristic, but a characteristic that both the defendant and Green happened to share. The State likens it to a tattoo, ear piercing, or certain style of clothing in attempting to show that the race of the juror was not determinative. The State contends that the sole issue at trial was identity, and that because Green was the only member of the jury with hair braids, he or other jurors might have been affected if testimony came in that the defendant wore hair braids.

## District Court's Decision

The district judge in rendering his decision did not individually address each juror who was struck with the exception of Green. Instead, the district judge held that after considering all the relevant factors, Bolton had not met his burden of proving purposeful discrimination. The district judge noted that of the 50 potential jurors, less than half, 20, were African-American. He also noted that of the 12 jurors who served on the final panel, 7 were African-American, 1 was Hispanic, and the other 4 were Caucasian. The district judge noted that the State's explanation for the strike of each juror only had to be facially valid, not persuasive or plausible, and held that the State's explanations met this requirement. The district court noted that similar circumstances evidence should be considered, but held that it is not conclusive. The district judge also considered the fact the prosecutor had six additional strikes he could have used to remove more African-Americans from the panel but did not do so.

As for the prosecutor's explanation for striking Green, the district judge considered the presence of hair braids to be a "borderline" reason for striking a juror because the vast majority of those with that particular hairstyle are African-American. The court rationalized, however, that when you coupled this reason with the others and with all the factors, especially the credibility of the pros-

ecutor in this case and the number of African-American jurors who served in the case compared to the number that were available to serve, the strikes were not racially motivated.

## Analysis

On appeal, Bolton contends the Equal Protection Clause of Section 1 of the Kansas Constitution Bill of Rights provides greater protection than that afforded by the United States Constitution. Specifically, Bolton contends that this court should find that under the Kansas Constitution a prosecutor's reasons for exercising a peremptory challenge must be more than just facially valid. He contends that the reasons must also have some relationship to the case at hand. Thus, Bolton contends that reasons such as the juror was late returning from a break, was a church janitor, etc., would not meet this standard because they are unrelated to the case.

Bolton cites to *Parker v. State*, 219 Ga. App. 361, 364-65, 464 S.E.2d 910 (1995), in support of this argument, as well as to Kansas jurisprudence history. In *Parker*, the Georgia Court of Appeals applied a higher standard than that mandated by the United States Supreme Court in *Purkett*. The *Parker* court required that in addition to the reasons being racially neutral, they must also relate to the case at hand. 219 Ga. App. at 364. In a concurring opinion, Judge Pope noted that Georgia courts have consistently required the State's racially-neutral reasons to be related to the case, explaining that the Georgia Constitution's Equal Protection Clause provides for the additional protection. 219 Ga. App. at 365.

Bolton contends that Kansas courts have recognized that the Kansas Constitution's Equal Protection Clause provides greater personal rights than the United States Constitution, citing *Farley v. Engelken*, 241 Kan. 663, 740 P.2d 1058 (1987), in support. In *Farley*, this court noted that "the Kansas Constitution affords separate, adequate, and greater rights than the federal Constitution," in deciding a case under Sections 1 and 18 of the Kansas Constitution Bill of Rights. 241 Kan. at 671.

Section 1 of the Kansas Constitution Bill of Rights is the Equal Protection Clause. *Stephenson v. Sugar Creek Packing*, 250 Kan. 768, 778, 830 P.2d 41 (1992).

"All men are possessed of equal and inalienable natural rights, among which are life, liberty, and the pursuit of happiness." Kan. Const. Bill of Rights, § 1.

This court has also held on other occasions that Section 1 of the Kansas Constitution Bill of Rights is given much the same effect as the Equal Protection Clause of the Fourteenth Amendment. *State ex rel. Tomasic v. City of Kansas City*, 237 Kan. 572, 584, 701 P.2d 1314 (1985); *State ex rel. Tomasic v. Kansas City, Kansas Port Authority*, 230 Kan. 404, 426, 636 P.2d 760 (1981); see also *State ex rel. Stephan v. Parrish*, 257 Kan. 294, Syl. ¶ 5, 891 P.2d 445 (1995) ("The Equal Protection Clause of the Fourteenth Amendment to the United States Constitution finds its counterpart in §§ 1 and 2 of the Bill of Rights of the Kansas Constitution.").

It appears that Bolton's contention that Section 1 of the Kansas Constitution Bill of Rights requires the reason for the strike to have a relationship with the case is an issue of first impression. Under our prior case law, this court has continuously required only a facially valid reason for a strike and has never imposed the additional requirement of relationship to the case. See, *e.g., Alexander*, 268 Kan. at 620; *State v. Sanders*, 263 Kan. 317, 324, 949 P.2d 1084 (1997). This court addressed the contention that the *Purkett* decision allowed attorneys too much leeway in formulating race-neutral reasons in *State v. Adams*, 269 Kan. 681, 687-88, 8 P.3d 724 (2000), by responding that it is during the third step of the analysis that the district judge has the ability to reject any pretextual race-neutral justifications.

Bolton presents no argument that would warrant this court to find the Kansas Constitution provides greater protection under this particular circumstance. Thus, the prosecutor is only required to to put forth a facially valid reason for exercising a peremptory strike to satisfy the second step of the *Batson* analysis.

Bolton also contends the reasons given by the State for exercising the six peremptory challenges against African-Americans were not facially valid. Specifically, Bolton points to the fact that the prosecutor claimed to have removed Smith because of his back problems, even though Smith assured the court that he was capable of sitting during the trial. Bolton also points out that Bryant was

claimed to have been removed because she had contact with juveniles through her work in maintenance at the Johnson County Juvenile Detention Center, but that Bryant never worked at the Johnson County Juvenile Detention Center.

As for the prosecutor's erroneous claim that Bryant had contact with juveniles through her work at the Johnson County Juvenile Detention Center, the mistake does not require that Bolton be granted a new trial. The State concedes in its brief that it was a mistake and posits a reasonable explanation.

More importantly, however, Bolton did not point to this error at the hearing. In *State v. Poole*, 252 Kan. 108, 843 P.2d 689 (1992), the State asserted that it had struck a member of the jury because she did not have children and that those left on the panel had children. The defense contended that another member of the jury panel, Constance Mason, who was not struck, also did not have children. According to the transcript at voir dire, Mason had stated that she did not have children. This court noted that the trial court had heard the evidence and the prosecution's explanation, but that defense counsel and the trial court had not challenged the prosecutor's statement that all other jurors had children. Under those circumstances, this court held that the trial court's finding that the reason was racially neutral was not clearly erroneous. 252 Kan. at 111. Thus, after *Poole*, it appears that if the defendant or the trial court do not correct errors in statements of fact as presented by the prosecutor as reasons for exercising peremptory challenges, these facts will be considered as true for purposes of determining whether the prosecutor set forth a race-neutral reason for the strike.

Even without considering this erroneous fact, however, the prosecutor set forth two other race-neutral reasons for the removal of Bryant: her granddaughter's father was arrested on a drug charge and she was retired from the Social Security Administration.

After reviewing the prosecutor's explanations in their entirety, the basis articulated to the trial court for striking each African-American was facially valid. Thus, this court is left to examine the third step of the *Batson* analysis.

As the district judge noted, the credibility of the prosecutor and the comparison of the number of African-Americans who served on the jury, 7 of 12, to the number of African-Americans who were on the original panel, 20 of 50, played a large role in his decision that the there was no purposeful discrimination. As stated previously, this court gives great deference to the trial court's judgment of credibility in these instances. *Alexander*, 268 Kan. at 619. This court has also previously recognized that it is appropriate to consider the number of potential jurors of the race allegedly discriminated against as compared to the number of jurors of that race who served on the jury in determining whether there was purposeful discrimination. See *Adams*, 269 Kan. at 687 (presence of African-Americans on the jury is one of several factors to consider in deciding whether race-based strikes have occurred; prosecutor had additional strikes she could have used to remove additional African-Americans from the jury); *Vargas*, 260 Kan. at 795 (trial judge can objectively compare numbers or other facts and subjectively evaluate credibility of prosecutor in explaining reasons for each challenged strike); *Poole*, 252 Kan. at 114 (percentage of African-Americans on venire panel and percentage of African-Americans who end up on jury panel, although not determinative, is relevant in determining whether there was purposeful discrimination).

Thus, under these circumstances, the trial court did not err in finding there was no purposeful discrimination in the State's exercise of peremptory strikes against six African-Americans.

Affirmed.